Matter of G.A.B. (2004 NY Slip Op 50815(U))

[*1]

Matter of G.A.B.

2004 NY Slip Op 50815(U)

Decided on May 21, 2004

Family Court, Suffolk County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 21, 2004

Family Court, Suffolk County
G.A.B., A Child under Eighteen Years of Age 
 Alleged to be Neglected by G. W., Respondent.
N-10643-03

FOR PETITIONER: Thomas J. Spota III, County Attorney (Randall J. Ratje, Esq. of counsel), 400 Carleton Avenue, Central Islip, NY 11722. FOR RESPONDENT: Shawn R. Kassman, Esq., 110 Carleton Avenue, Central Islip, NY 11722. GUARDIAN AD LITEM: Robert Gallo, Esq., 622 Hawkins Ave., Suite 2, Lake Ronkonkoma, NY 11779. LAW GUARDIAN: Catherine Seybert, Esq., Law Guardian Bureau, 400 Carleton Avenue, Central Islip, NY 11722.

Barbara Lynaugh, J.
In this child protective proceeding brought pursuant to F.C.A. Article 10, the petitioner, Suffolk County Department of Social Services/Child Protective Services (hereinafter "DSS" or "CPS"), seeks an adjudication that the subject child G. A. B., born 6/6/03, is a neglected child within the meaning of FCA § 1012(f)(i)(B).
By petition dated 6/30/03, CPS alleges that respondent-mother has placed the child "at imminent risk of becoming physically, mentally and emotionally impaired, in that respondent's seriously impaired mental condition renders her unable to provide adequate guardianship, supervision and care to the child." CPS further alleges that mother "has failed to secure suitable housing for the child."
Mother was served with the summons and petition herein, but did not appear on the first court date of 7/3/03. At that time, an order was issued pursuant to FCA §1027 placing the child in the custody of maternal grandmother, and an order of protection was issued pursuant to FCA § 1029 restricting mother's contact with the child to visitation supervised by DSS.
Mother appeared on the second court date and was assigned counsel. At the request of mother's attorney, and on petitioner's consent, i.e., without a hearing, a guardian ad litem was assigned for mother. The matter subsequently proceeded to a fact finding hearing, during which mother, although not physically present herself, appeared through counsel and guardian ad litem.
Having heard the evidence presented by the parties at the fact-finding hearing and after due and careful consideration thereof, the court makes the following findings and conclusions.
[*2]
The allegations of neglect are predicated primarily upon mother's alleged psychiatric condition, which purportedly renders her unable to care for the child, and upon mother's alleged failure to provide the child with adequate housing.
In support of their allegations, CPS called two witnesses and presented mother's voluminous medical (emergency room and labor and delivery) records from the University Hospital at Stony Brook. No records of mother's purported "multiple psychiatric hospitalizations due to behavioral and psychotic episodes" (see addendum to petition) were submitted; no psychiatrists were called to testify.
The hospital records indicate that this was the first pregnancy for mother, who is 20-years-old and homeless. Mother describes herself as having essentially been discarded by her family for the past few years following several apparently unsuccessful placements in various juvenile residential treatment facilities. Mother now resides in an emergency housing shelter/rooming house in less than stellar conditions. This housing is being provided to mother by DSS, i.e., the presentment agency herein.
The only purported evidence of mother's alleged "seriously impaired mental condition," for the one-year period prior to the birth of the subject child, is the somewhat vague and inconsistent psychiatric history provided to the hospital and prenatal clinic staff by mother herself.
On 10/29/02, mother reported receiving disability benefits for an emotional disability which she described as depression. On 10/11/02, mother reported having a psychiatric diagnosis of paranoid schizophrenia and indicated she had stopped taking her medication when she became pregnant. The uselessness of this information was duly noted by a hospital staff member, who described mother as being a "poor historian."
For the one year prior to the birth of the child, mother did have many visits to the Stony Brook emergency room for psychiatric evaluations. On each visit, however, mother was seen and discharged the same day, and there is no indication on any of these visits that mother was ever found to be a danger to herself or anyone else. Urine toxicology tests done during these visits were negative. There is no evidence of the poly-substance abuse alleged in the petition.
A closer examination of these records reveals that mother's main complaints leading to these emergency room psychiatric evaluations were related to problems she was having with the housing facility in which she was placed and with some of the other residents of the facility. There was no evidence during any of these visits of any psychotic symptomatology. There was one visit during which mother admitted making up a story about hearing voices so she would be taken to the emergency room and out of the shelter.
The records from mother's hospitalization for her maternity visit raise further questions [*3]regarding the actual nature of her alleged mental illness. The physician's admitting note indicates that mother had prenatal care at Coram Health Center and that she had a "psychiatric diagnosis which may be schizophrenia" (emphasis added) with no reference as to the source of that diagnosis. Mother was cooperative and had a normal delivery.
The "RN's mental status exam" reveals that mother was cooperative and calm and last had psychotic symptoms three years ago. The social worker's note describes mother as pleasant and cooperative. Although mother had stopped taking her medication when she first became pregnant, there is no evidence anywhere in the records that mother displayed any psychotic symptoms, any unexpected or irrational behaviors, or any other signs of mental illness.
It is hard to imagine how a 20-year-old with a "seriously impaired mental condition" so severe that it renders her unable to care for a child could go without medication for nine months, endure the added stress of her first pregnancy, abide the additional burden of a full period of labor and delivery, and remain calm and cooperative throughout, with no signs or symptoms of mental illness of any kind at any time. No expert witness was called to explain this apparent phenomenon.
Equally unilluminating were the results of the neurology and psychiatric examinations conducted while mother was in the hospital. The neurologist noted "possible mental retardation," "past neuro[logical] history unclear," history of "schizophrenia vs schizoaffective disorder" (with no indication of the source of this "history.") The neurologist describes mother as "awake, alert, childlike behavior, cooperative...," goes on to note "not clear whether or not she has a true seizure disorder," and concludes with "no specific recommendations."
The psychiatric consultation begins with the basis for the referral: "to assess for depression/psychosis...history of schizoaffective disorder...long history of mental illness..." (again, no source of this information is given), "borderline intellectual functioning..." (no tests were administered and no source was given), "seizure disorder..." (which was questioned by the neurologist), "polysubstance abuse in the past..."(no basis given for this information).
The psychiatrist then goes on to describe mother's "thought process" as "concrete, circumstantial" and notes that she was "alert x 3," had "good mood and affect," and could return to the shelter. The examination concludes with the physician questioning mother's "capacity to care for her newborn." Shortly thereafter, the psychiatric attending physician writes a brief conclusory note in which the following is indicated: "patient does not have capacity to care for her newborn." Although there is no indication of how or why this conclusion is reached, this apparently became the basis of the present proceeding.
A review of mother's earlier emergency room records from Stony Brook Hospital reveal a variety of inconsistent diagnoses and a well-documented predilection on mother's part to invent psychiatric symptoms.
[*4]
On 8/24/02, mother was diagnosed with "schizoaffective disorder" and was released from the emergency room. On 5/14/02, mother was brought to the emergency room after threatening a resident at the shelter who had threatened her. She was diagnosed with "schizoaffective disorder, bipolar type" which was responding well to medication. Mother was transferred to Brunswick Hospital. It is unknown whether mother was actually hospitalized at Brunswick, as those records were not produced.
On 12/4/01, mother was brought to the emergency room stating she wanted to kill herself because she did not like where she was living. She was transferred to the Holliswood facility for "further treatment and evaluation."
It is unclear what type of facility Holliswood is or whether mother was actually admitted there, as those records were similarly not produced.
On 11/29/01, mother was diagnosed with "schizoaffective disorder, depressed type" and was released from the emergency room. On 10/25/01, mother was diagnosed with "adjustment disorder" and released from the emergency room.
On 10/11/01, mother was brought to the emergency room and was ready to be released when she had an adverse effect from her medication and was transferred to Southside Hospital. The record indicates that mother has a history of "confabulating," is a "poor historian," and further notes "chronic attention seeking by patient who fabricates psychiatric symptoms and behaviors."
A few days earlier, on 10/7/o1, mother was brought to the emergency room by the staff of the group home in which she was then residing. The records indicate that "staff of group home verifies that patient is lying constantly about psychiatric symptoms and behaviors." Mother was diagnosed with depression and released from the emergency room. A few days prior, mother was brought to the emergency room because she had acted out in the group home. She was "calm and cooperative" in the emergency room and was discharged back to the home with a diagnosis of "adjustment disorder."
Going back a full two years prior to the birth of the subject child herein, on 6/2/01, mother was brought to the Stony Brook emergency room by the staff of Madonna Heights, the juvenile residential treatment facility in which she was placed at the time, when she had threatened to hurt herself. Mother was admitted to South Oaks, a psychiatric hospital. No diagnosis was indicated in the emergency room records, and the records from South Oaks were not produced.
There were two other emergency room visits in 2001, on 2/24/01 and 1/27/01. On each of these visits, mother was brought in by the Madonna Heights staff and transferred to Brunswick Hospital. No diagnoses were given on either of these visits; the Brunswick Hospital records were not produced.
In addition to the emergency room records, there were two witnesses called by CPS. The [*5]first witness was Darlene Gelin, a medical social worker from University Hospital. Ms. Gelin met with mother only once, shortly after mother had just given birth, to discuss mother's plans for the child. Ms. Gelin was unaware if mother had received any anesthesia during the delivery or any pain medication afterwards. The extent of Ms. Gelin's testimony was that she found mother to be "infantile" because she "presented herself as a child" and "almost saw the child as a doll." Ms. Gelin filed a report of suspected neglect with the CPS State Central Registry (SCR) stating that her main concern was mother's "immaturity."
The other witness called was Brian Calo, a senior CPS caseworker with emergency services. Mr. Calo investigated the SCR report filed by Ms. Gelin and met with mother once in the hospital. Mr. Calo found mother to be "very cooperative and gentle." He indicated that the DSS-provided housing shelter in which mother resided was unsuitable for a child because of drug and criminal activity. The reason for the continued public funding of such egregiously dangerous and unsuitable housing was unclear.
What is clear is that if anyone is to be found neglectful by this court for expecting a child to live in such atrocious housing, it is not going to be mother. Since DSS, the presentment agency herein, has provided the very housing they now find so unacceptable and since they have failed to provide mother with any suitable alternative housing resources, the allegation of neglect predicated upon inadequate housing is dismissed.
When Mr. Calo asked mother about her ability to care for the child, she indicated that she had learned about infant care from watching movies. Mr. Calo further indicated that he was not qualified to make an assessment regarding mother's learning abilities. Mr. Calo discussed with mother preventative services available through DSS, but offered no specific assistance to mother regarding housing or other services she might need.
A review of the evidence presented leads this court to conclude that the petitioner has failed to meet its burden of proof and has failed to show that the subject child is a neglected child within the meaning of FCA §1012(f)(i)(B).
"A finding of neglect may be predicated upon proof that a child's physical, mental, or emotional condition is in imminent danger of becoming impaired as a result of a parent's mental illness." F.C.A. §1012(f)(i)(B); Matter of Soma H., 
306 AD2d 531, 761 NYS2d 684 (2d Dept., 2003). Although no demonstration of actual harm to the child is necessary to support such a finding, Matter of Karyn D., 282 AD2d 746, 724 NYS2d 335 (2d Dept., 2001), proof of the parent's mental illness must be established by a preponderance of the credible evidence.
F.C.A. §1046(b)(i).
Neither expert testimony nor a definitive psychiatric diagnosis are necessary to establish a finding of neglect predicated upon a parent's mental illness. In re Caress S., 250 AD2d 490, 673 NYS2d 123 (1st Dept., 1998); Matter
[*6]
of Zariyasta S., 158 AD2d 45, 557 NYS2d 895 (1st Dept., 1990). However, the quantum of proof should, at the very least, include demonstrable behavioral manifestations on the part of the parent sufficient to support a conclusion that there would be a "substantial probability of neglect" causing the subject child to be at risk if placed in the parent's custody. Matter of Baby Boy E., 187 AD2d 512,
589 NYS2d 587 (2d Dept., 1992); In re Eugene G., 76 AD2d 781, 429 NYS2d 17 (1980).
In Matter of Soma H., supra, the subject child was found to be neglected where father was diagnosed with chronic schizophrenia with delusions and had experienced daily auditory hallucinations for years. Father was hearing voices which told him to kill people and molest children. Father's psychiatrist testified that father should not be permitted to care for the child.
A mother's schizoaffective disorder, bipolar type, which lead to three hospitalizations in one year because of her psychotic behaviors, suicidal ideations and severe beating of her 9-year-old child, was the basis of a finding of neglect in Matter of Alena O., 220 AD2d 358, 633 NYS2d 127 (1st Dept., 1995). The court found that the family "was overwhelmed by the negative effects of [mother's] mental illness on her parenting ability."
In Matter of William O., et. al., 220 AD2d 842, 632 NYS2d 259 (3d Dept., 1995), neglect was established where mother's mental illness had a direct impact on the emotional health of her children. Mother experienced frequent psychotic delusions involving satanic ritualistic sexual abuse of her two children by their father. The children, through their closeness to their mother, then began to experience these same delusions while in mother's custody. Once the children were removed from mother, their psychotic symptoms completely abated.
Such pronounced psychotic symptoms need not be present to support a finding of neglect. In In re Caress S., supra, mother's bizarre behavior and erratic temperament coupled with her reluctance to attend psychiatric treatment sessions were sufficient to support a finding of neglect even in the absence of proof of a definitive mental illness. In Matter of Nassau County DSS on Behalf of Raul, 231 AD2d 523, 647 NYS2d 262 (2d Dept., 1996), neglect was established predicated upon mother's psychosis, paranoid schizophrenia, personality disorder, and resistance to treatment, which led to behavioral problems and threats against the subject child and maternal grandmother.
In the case at bar, we have a homeless 20-year-old girl, abandoned by her family after years of unsuccessful out of home placements, who has had her first baby. While there may be a suggestion of some prior diagnoses of mental illness years before the child's birth, it is inconsistent, vague, and conclusory at best.
It has long been held that a psychiatric diagnosis or prior psychiatric hospitalizations, standing alone, are insufficient to establish neglect per se. Matter of Daniel C., 47 AD2d 160, 365 NYS2d 535 (1st Dept., 1975).
[*7]
The evidence presented demonstrates that for more than a year prior to the birth of her child, mother has had no psychiatric hospitalizations, no psychotic symptomatology, no thought disturbance, no dangerous behavior. Quite to the contrary, mother has been consistently depicted as calm, cooperative, pleasant, clear thinking, and well-oriented. Remarkably, mother has remained stable throughout a full pregnancy without medication. The main concern here is mother's "immaturity."
Assuming, arguendo, that the evidence herein permits the inference that mother does indeed suffer from a mental illness, it is clear that a finding of neglect is not warranted where, as here, there is no demonstration of any threat
to the welfare of the subject child. Matter of the H. Children, 156 AD2d 520,
548 NYS2d 586 (2d Dept., 1989).
There is, quite simply, a complete paucity of proof to support a finding that
the subject child's physical, mental, or emotional condition is in imminent danger of becoming impaired as a result of mother's alleged mental illness within the meaning of F.C.A. §1012(f)(i)(B). 
In view of the foregoing, the court finds that the allegations in the petition have not been established by a preponderance of the evidence. Accordingly, the petition is dismissed for failure to establish a prima facie case, and all prior orders are hereby vacated.
This is the decision and order of the court.
Dated: May 21, 2004 
BARBARA LYNAUGH
FAMILY COURT JUDGE