■ In the Matter of TEQUAN R., a Child Alleged to be Neglected. JOYCE McC., Appellant; ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent, et al., Respondent. In the Matter of JAMES TYRONE R., Respondent, v JOYCE McC., Appellant, and ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [841 NYS2d 535]—

Orders, Family Court, New York County (Sara P. Schechter, J.), entered on or about August 18 and 29, 2005, which, following a fact-finding determination that respondent mother had neglected her son Tequan R., awarded legal custody and guardianship to the child's father, with visitation to the mother, unanimously reversed, on the law, without costs, the orders vacated, and the matter remanded for new fact-finding and dispositional hearings before a different judge.

Joyce McC. and James R. are the parents of three children, Lasaiah, Dejon and Tequan. In March 2001, findings of neglect were entered against Joyce after she admitted to using excessive corporal punishment with respect to Dejon. Derivative findings of neglect were made with respect to Tequan and Lasaiah. As a result, Dejon and Lasaiah were placed in the custody of the Administration for Children's Services (ACS) and Tequan was placed in the custody of his father, James R. In November 2002 and March 2003, respectively, Dejon and Lasaiah were trial discharged to Joyce and Tequan was returned to her custody at approximately the same time.

On March 1, 2005, James R. filed a petition requesting custody of Tequan. On March 8, ACS filed a petition alleging that Joyce had neglected Tequan. On April 12, ACS filed an amended neglect petition naming Joyce and James as respondents. Referencing the prior neglect findings regarding Tequan's siblings, the amended petition alleged, inter alia, that Tequan was derivatively neglected because Joyce had failed to provide Dejon with adequate food, clothing, shelter or (based upon Dejon's excessive absences from school) education, and her failure to address Dejon's diagnosed attention deficit hyperactivity disorder (ADHD); that she failed to provide Tequan with proper supervision in that Tequan was at one point found by James R. wandering the streets alone; that her home was extremely dirty; that she failed to complete the intake process at preventative services; and that she failed to contact Lasaiah's school to

determine the results of a special education evaluation and follow through with nutritional services to address Lasaiah's weight problem.

With respect to James R., the ACS amended petition alleged, inter alia, that he used excessive corporal punishment against Tequan; that Tequan stated he did not want to be with his father; that James cannot control his temper; that he scared the children and created an uncomfortable and unsafe environment for them; and that he was a violent and dangerous person against whom Joyce had filed a domestic offense petition.

On May 12, 2005, the court held a combined fact-finding hearing on both petitions and took judicial notice of the prior neglect findings against the mother.

At the hearing, Angela Grill, the ACS caseworker assigned to the case, testified that she was assigned to the case in June 2004. She found the condition of the home appropriate, but the children were sleeping on mattresses on the floor. The home was unkempt but not dirty. Grill discussed various issues with Joyce, specifically the importance of Joyce's compliance with preventative services, as well as the need to discuss with a doctor Lasaiah's weight control problem and the reports that Lasaiah and Dejon were wetting themselves. She also stressed the need for Joyce to obtain alternate medication for Dejon's ADHD, inasmuch as Joyce had discontinued his medication, claiming it made him sleepy and groggy.

Joyce was not present when Grill made her July visit. Joyce had not enrolled the children in summer school and they were being supervised by an aunt. After making several attempts, Grill finally met with Joyce in August and stressed the need for Joyce to be available for her visits. Joyce had not followed up on either the wetting or medication issues and the children still did not have beds.

During the next several months, Joyce did not follow up on these or other issues, such as addressing Lasaiah's weight problem, Dejon's misbehavior in and excessive absences from school, preventative care referrals, and missing appointments. Grill testified that on February 27, 2005 she received a report from the 43rd Precinct alleging that Tequan was found by James wandering alone in the street. Joyce denied all these allegations. With regard to the allegation that she permitted Tequan to wander the streets alone, Joyce stated that she and James had an argument and James "grabbed Tequan off the street."

Grill also visited James's home and found it to be "very cluttered." When she advised him that boxes had to be removed for safety reasons from the room where Tequan would be sleeping,

James became agitated, and became even more so when Grill discussed his criminal record with him.

On June 9, 2005, Joyce testified as an ACS witness. She stated that she had filed a domestic violence petition against James, and that he had threatened to kill her on numerous occasions, including just prior to the filing of the petition. She stated he had physically abused her over the past five years and struck and choked her in the presence of the children. She sustained bruises on her neck and a black eye at his hands. Joyce also testified that in 2004, James had to be removed from her home by the police when he refused to leave after threatening her and her sisters with a knife. She also testified that in 2003, he beat and raped her. Joyce stated James never provided financial support and that Tequan did not want to live with James because of his violence. However, she did not believe James would harm Tequan the way he hurt her. ACS rested on its petition. James, in his subsequent testimony, denied being a violent person, denied the incidents as described by Joyce, and denied that he took Tequan after an argument. He claimed that he found Tequan wandering in the street unsupervised and brought him to the precinct.

On July 13, Joyce testified in her own defense on the neglect petition. She stated that except for one occasion, she was home every time Grill visited the home. She denied being told Lasaiah had a weight problem, claimed Dejon could not be evaluated for ADHD when they moved from Brooklyn to Manhattan, denied Dejon and Lasaiah had a wetting problem, and explained that Dejon had missed school because there was no water in the apartment complex for a month.

On cross-examination, she admitted that she stopped giving Dejon his medication because she did not like the side effects, that she never had him evaluated although advised by Grill to do so, and that she never reported that James hit Tequan.

On July 18, the case was scheduled for continued cross-examination of Joyce. Neither she nor her attorney was present when the court convened, although her counsel arrived during the direct of James and she arrived during his cross. The court, sua sponte, struck Joyce's direct testimony given on July 13, which was not fully subject to cross-examination. Her June 9 testimony, given as an ACS witness, was not stricken.

On July 19, Joyce's counsel requested that her direct testimony be reinstated and that he be allowed to call additional witnesses. The court permitted counsel to call additional witnesses but denied his request to reinstate her direct testimony.

The July 19, 2005 fact-finding order found that Joyce had ne-

glected the children based on her having missed numerous appointments for the children's therapy, nutritional services and school issues, and due to her failure to engage in therapy for herself as ordered. The court further found that Joyce maintained her home in poor condition and failed to send Dejon to school on a regular basis. Based on the failures with respect to Lasaiah and Dejon, Tequan was found to be derivatively neglected. The petition against James was dismissed.

At the dispositional hearing, a number of reports were admitted into evidence, including a report from ACS that made no dispositional recommendation. A caseworker from Lakeside Family and Children's Service, the agency where Tequan was placed, testified that James had only visited Tequan two or three times while he was in foster care. Although those visits went well, Tequan told the caseworker that he wanted to live with his mother and did not want to live with his father.

Angela Grill testified that she discussed a plan with James in the event that Tequan was placed with him. James had selected a school but not a doctor. Tequan told Grill that his father "whooped his butt" when he visited him and that he was afraid of his father. He also told a social worker from the Legal Aid Society who testified at the hearing that he did not want to live with his father, discussed the "whippings" his father had given him, and stated he wanted to live with his mother.

Joyce testified that she objected to James obtaining custody of Tequan, especially because of the excessive corporal punishments she witnessed James inflict on Tequan. She was precluded from testifying about the domestic violence incidents. She testified that she had not received any services or counseling at the time of the hearing.

James testified he lived with his mother and sister and worked full time at night. He would be available during the day and Tequan could be supervised while he was at work by his mother and sister. He denied "whipping" Tequan.

On August 18, 2005, the court granted James custody of Tequan and granted Joyce and Tequan's siblings visitation.

Family Court Act § 1012 (f) (i) provides that a finding of neglect requires proof that the child's "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the [parent's failure] to exercise a minimum degree of care" with regard to food, clothing, shelter, education or medical needs, or to provide proper supervision "by . . . inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment" (§ 1012 [f] [i] [B]). Moreover, the evi-

dence must show a "causal connection between the basis for the neglect petition and the circumstances that allegedly produce the child's impairment or imminent danger of impairment" (*Nicholson v Scoppetta*, 3 NY3d 357, 369 [2004]).

Proof of neglect as to one child shall be admissible evidence on the issue of neglect as to another child (Family Ct Act § 1046 [a] [i]). However, proof of neglect of one child is not sufficient to support a derivative finding of neglect as to another unless it is demonstrated that the subject child is in actual or imminent danger of abuse or neglect. "[I]mminent danger of impairment to a child is an independent and separate ground on which a neglect finding may be based" (*Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79 [1995]).

Once actual or imminent danger of abuse or neglect has been shown, a finding of neglect also requires proof of the parent's failure to exercise a "minimum degree of care," which is a "baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet" (Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1012, at 326 [1999]). Thus, even in the absence of direct evidence of actual abuse or neglect of the subject child, "derivative findings of neglect should be entered where the evidence as to the directly abused or neglected child or children demonstrates such an impaired level of parental judgment as to create a substantial risk of harm for any child in their care" (*Matter of Vincent M.*, 193 AD2d 398, 404 [1993]).

The findings of neglect here were based upon Joyce's missing numerous appointments for Tequan's siblings' therapy, nutritional services and school issues; failure to send Dejon to school on a regular basis; maintaining her home in a dirty condition; and failure to undertake therapy for herself. Significantly, the court did not base its findings on the allegations concerning Tequan's wandering the streets alone. It should be noted that no medical evidence was offered at the fact-finding hearing to support Grill's opinion regarding Lasaiah's weight problem or Dejon's ADHD issue. The only evidence regarding the dirty condition of Joyce's home came from James, and this was directly contradicted by Grill.

Most importantly, outside of the controverted testimony regarding Tequan's wandering the streets alone, there was no evidence pertaining to Joyce's care of Tequan or any evidence that her failures with respect to Dejon and Lasaiah resulted in or created a risk of harm to Tequan.

The presentment agency failed to prove by a preponderance of the evidence that Tequan was in imminent danger due to

parental failure to exercise "a minimum degree of care" (*see Nicholson, supra,* 3 NY3d at 370). Nor is a derivative finding of neglect sustainable based upon Joyce's conduct with respect to the other children; that conduct, based upon the evidence adduced at the fact-finding hearing, "was not so egregious as to support a conclusion that [she] lacked the requisite judgment to function as [an] adequate parent[ ]" (*Matter of Summer Y.-T.,* 32 AD3d 212 [2006]).

We need not reach the issue as to whether the court correctly determined it was in the best interest of Tequan to award custody to James, since the validity of the dispositional orders rested upon the correctness of the initial determination of neglect, and should thus be vacated (*Matter of Daniel C.,* 47 AD2d 160, 165 [1975]).

We agree that Joyce was deprived of due process when the court continued the fact-finding hearing in her absence and struck her testimony from the record. There is no question that due process must be observed in child protective proceedings (*Matter of Hanson,* 51 AD2d 696 [1976]). Here, both Joyce and her attorney appeared late for the continuation of the hearing. She had already completed her direct testimony and was in the process of being cross-examined when the court recessed for the day. Her cross-examination could have been continued when she did appear, and an appropriate sanction short of striking her testimony could have been imposed. Moreover, the court abused its discretion by refusing, while the fact-finding hearing was still in progress, to reinstate her testimony, especially after permitting her attorney to call additional witnesses. Additionally, it was error to preclude Joyce from testifying about domestic violence incidents during the dispositional hearing, as such incidents were clearly relevant to the custody determination.

By depriving Joyce of a meaningful opportunity to be heard, her due process rights were violated (*Matter of Roy Anthony A.,* 59 AD2d 662, 663 [1977]), and on remand the case should be heard by a different Family Court judge. Concur—Andrias, J.P., Friedman, Sweeny, McGuire and Kavanagh JJ.