■ In the Matter of KAYLA W., a Child Alleged to be Neglected. ATARA W., Appellant; COMMISSIONER OF THE ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [850 NYS2d 86]—

Order of disposition, Family Court, New York County (Sara P. Schecter, J.), entered on or about January 6, 2006, which, after a fact-finding determination of neglect, placed the subject child in the custody of the Commissioner of Social Services of New York County for six months, affirmed, insofar as it brings up for review the fact-finding determination, and the appeal therefrom otherwise dismissed, without costs.

The finding of neglect is supported by a preponderance of the evidence which established that respondent suffers from a mental illness, namely, major depressive disorder, and, as a result, presently is and for the foreseeable future will be unable to adequately care for the child (see Matter of Laura D., 270 AD2d 260 [2000]; see also Matter of Naticia Q., 195 AD2d 616, 617-618 [1993]). In particular, Dr. Matta, deemed an expert in the field of psychiatry, testified that, at his initial interview with respondent following her admission to St. Vincent's Hospital, respondent was "very depressed and tearful," "not very cooperative with the interview," and did not want to discuss her symptoms. Before Dr. Matta was able to conduct a second interview three days later, respondent became "extremely agitated," exhibited "low frustration tolerance," was tearful, and unable to respond to verbal direction. In addition, respondent was cursing at and threatening the staff. Consequently, respondent had to be sedated and restrained. When Dr. Matta finally was able to interview respondent, she exhibited poor insight into her condition and the need for treatment. The next day, respondent punched a wall so hard that she caused visible damage to her hand.

Contrary to respondent's contention, Dr. Matta did relate respondent's behavior, lack of insight, inability to cope, poor judgment, and poor prognosis for follow-up treatment to her ability to care for her daughter. Specifically, Dr. Matta testified that "at that time, given [respondent's] impulsivity and inability to care for her child, . . . she would be a danger to her child."

Dr. Moore, a psychologist at Covenant House, met with respondent before referring her to St. Vincent's. Dr. Moore testified that during their session, respondent was "extraordinarily tired" and "very unresponsive." Although Dr. Moore eventually elicited a slight response during the session, respondent exploded when, after being told that a taxi would be provided for her transportation home, she was given a MetroCard instead. Even after being advised that a taxi would still be provided, respondent "started screaming and yelling and waving her hands in the air." Dr. Moore testified that respondent "threw her pocketbook down and . . . said . . . she was fed up with everybody and everything." In addition, Dr. Moore testified that the child was frightened, and the doctor was concerned for the child's safety.

A single incident "where the parent's judgment was strongly impaired and the child exposed to a risk of substantial harm" can sustain a finding of neglect (*Matter of Pedro C.*, 1 AD3d 267, 268 [2003]). Here, respondent's behavior was not limited to a single incident. Rather, respondent's poor impulse control, poor insight into her condition and depression continued over the course of several days. From this evidence, the doctors concluded a concomitant inability to care adequately for the child (*see e.g. Matter of Jason Brian B.*, 33 AD3d 995 [2006]; *Matter of Aaron MM.*, 152 AD2d 817 [1989]). In addition, it does not avail respondent that the child did not suffer actual injury (*see Matter of Pedro C.*, 1 AD3d at 268). Concur—Mazzarelli, J.P., Marlow and Williams, JJ.

Catterson and Kavanagh, JJ., dissent in a memorandum by Catterson, J., as follows: Because, in my view, the petitioner utterly failed to submit sufficient admissible proof to establish that appellant mother neglected her child, Kayla W., as a result of her mental illness, I respectfully dissent.

In support of its allegations that the appellant suffers mental illness, the petitioner relies almost entirely on the testimony of two doctors. The first, Dr. Moore, a psychologist employed by Covenant House Homeless Shelter, interviewed the appellant for two hours and initially recommended sending her to the Foundling Hospital for a period of rest because she seemed physically exhausted.

On the way out of Covenant House, with no cab fare, carrying her two-year-old daughter in her arms, and discovering that she faced a 10-block walk to the subway, the appellant became agitated. Consequently, Dr. Moore coaxed the appellant into a cab by asking her whether she would like to go to the hospital to get some rest. However, instead of sending her to the Foundling

Hospital, Dr. Moore sent the appellant to St. Vincent's Hospital for mental evaluation without informing the appellant of her destination.

At St. Vincent's, Dr. Matta, the second doctor to testify for the petitioner, observed the appellant for no more than a week after she was admitted. Dr. Matta testified that, while the appellant was severely depressed she was "without psychosis" and that her agitated and depressed mental state was a result of stress due to traumatic experiences including being homeless, suffering a miscarriage in the prior week and a history of physical and sexual abuse and domestic violence.*

Specifically, Dr. Matta's opinion of the appellant's condition was that she suffered from major depressive disorder, without psychosis, and post-traumatic stress disorder. In Dr. Matta's opinion, the appellant was unable to take care of her daughter because of emotional volatility, and the fact that the appellant required Haldol injections to calm her on *a couple of occasions* during her stay at the hospital. Dr. Matta further testified that, as the appellant's stay at the hospital progressed "she became more cooperative."

It is well established that to support a finding of neglect the petitioner is required to prove by a preponderance of the evidence that the physical, mental or emotional condition of the appellant's child is in imminent danger of becoming impaired due to the appellant's mental condition. (Family Ct Act § 1046 [b] [i]; § 1012 [f] [i]). Further, Social Services Law § 384-b (6) (a) defines mental illness as: "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act."

In my opinion, the psychiatric testimony provided by Dr. Moore and Dr. Matta was simply insufficient to satisfy the petitioner's burden of proof of establishing that the appellant suffered from a mental illness. Neither doctor observed the appellant for any extended period. Moreover, both doctors met and evaluated the appellant just a week after she had experienced the trauma of a miscarriage. (*Cf. Matter of Jesse DD.*, 223 AD2d 929, 931 [3d Dept 1996], *lv denied* 88 NY2d 803 [1996] [where the court relied on the testimony of five mental health professionals over a five month period]).

---

* It is important to note that the first time the appellant became aware that she was not admitted to a hospital for exhaustion was when she awoke the next day in the psychiatric ward subject to a psychiatric hold. Needless to say, this came as something of a shock to the appellant.

Further, Dr. Moore initially diagnosed physical exhaustion, which in my view, could have been a reasonable explanation for the appellant's outburst when faced with the long walk to the subway with the added burden of carrying a two year old. Later, the appellant characterized her agitation by acknowledging in her testimony that she had "lost it." The act of "losing it" in what was undeniably a stressful situation prompted Dr. Moore to immediately send the appellant for a psychiatric evaluation in a hospital. It does not warrant further conjecture as to the consequences of treating every mother who temporarily "loses it" in the same way as appellant was treated. Lastly, while a parent need not be psychotic for the court to find neglect based upon mental illness, the finding that a parent is "without psychosis," as in this case, remains relevant. (*See Matter of G.A.B.*, 4 Misc 3d 1011[A], 2004 NY Slip Op 50815[U] [Fam Ct 2004] [court relied on lack of psychotic symptomatology in dismissing petition]).

In the light of the foregoing, I believe there is insufficient evidence to conclude that the appellant was mentally ill within the meaning of the Social Services Law. (*See* Social Services Law § 384-b [6]). In any event, even assuming arguendo that the evidence permitted an inference that the appellant suffers from mental illness, I further believe that a finding of neglect is not warranted where, as here, there is no demonstration of any threat to the welfare of the appellant's child. (*Matter of G.A.B., supra.*)

It is well settled that proof of mental illness alone will not support a finding of neglect. The evidence must establish a causal connection between the respondent's condition, and actual or potential harm to the child. (*See Matter of H. Children*, 156 AD2d 520 [2d Dept 1989] [where petitioner proved some mental illness but did not show it had an effect on the children]; *Matter of Erica M.*, 206 AD2d 876 [4th Dept 1994]).

The petitioner contends that the appellant's child was subject to an imminent threat of harm due to the appellant's mental illness. Yet, petitioner has failed to submit sufficient evidence to connect the appellant's condition with the strong probability of future neglect. (*See id.* at 877 [error to find neglect where there was some evidence of mild mental instability, specifically that the respondent was "deteriorating," needed an in-patient examination, and was manic-depressive but no proof that the child was in danger]).

On the contrary, the record evinces that the appellant exhibits a considerable concern for the welfare of her child. She has visited her child regularly with just a couple of missed visita-

tions due to her need to find housing; she has successfully found adequate housing for herself and her child; and she has agreed to therapy, to take medications and to attend a parenting class. Furthermore, the petitioner's caseworker, Roy Warren, despite his recommendation that Kayla W. should not be returned to her mother based on her failure to comply with referrals, testified that the interaction between the appellant and her child during visitations was good, that the child was "very taken to her mother" and that the appellant "shows a lot of care and attention to the child."

While the petitioner points to the appellant's outburst in front of her child on the evening she was sedated at Covenant House as evidence of maltreatment of her child, there is simply a lack of proof concerning the impact of this incident on the child's physical, mental or emotional condition. Nor is there any proof that the incident was part of a pattern of aberrant behavior. (*Matter of Susan B.*, 102 AD2d 938 [3rd Dept 1984]).

The only evidence submitted to support a finding that Kayla W. was placed in imminent harm was the testimony of Dr. Moore, a witness to the incident, who stated that Kayla W. was frightened by her mother's outburst. A single incident of this kind, where the parent's judgment was strongly impaired by exhaustion and the trauma from experiencing a miscarriage in the prior week, and where there was no injury and the danger to the child was not great, does not constitute neglect. (*See Matter of Amanda E.*, 279 AD2d 917 [3rd Dept 2001] [given the circumstances under which the altercation occurred and the isolated nature of father's admittedly inappropriate conduct, father's conduct in striking his daughter did not constitute abuse or neglect]). It is worth repeating here that not all objectionable parental behavior falls within the legal definition of neglect. (*Matter of William EE.*, 157 AD2d 974 [3rd Dept 1990]).

Finally, where the petitioner points to the testimony of the doctors as to the appellant's lack of insight into her condition and her noncompliance with medication and treatment as evidence that her daughter is subject to an imminent risk of harm, this testimony is undermined by the brevity of contact that these doctors had with the appellant. In any event, the appellant explicitly testified that if given medication, and if referred to therapy once a week, she would cooperate. (*Cf. Matter of Domaniqua H. [Arlene H.]*, 1 AD3d 438 [2d Dept 2003], *lv denied* 1 NY3d 507 [2004] [where the finding of neglect was supported by a preponderance of the credible evidence, which demonstrated that the mother's mental illness and refusal to undergo psychiatric treatment placed her child in imminent danger]).

Although it is well settled that neither expert testimony nor a definitive psychiatric diagnosis are necessary to establish a finding of neglect predicated upon a parent's mental illness (*Matter of Caress S.*, 250 AD2d 490 [1st Dept 1998]; *Matter of Zariyasta S.*, 158 AD2d 45 [1st Dept 1990]) nevertheless, the quantum of proof should, at the very least, include demonstrable behavioral manifestations on the part of the parent sufficient to support a conclusion that there would be a "substantial probability of neglect" causing the subject child to be at risk if placed in the parent's custody. (*Matter of Baby Boy E.*, 187 AD2d 512 [2d Dept 1992]; *Matter of Eugene G.*, 76 AD2d 781 [1980], *lv dismissed* 51 NY2d 878 [1980].)

I fail to see that such a conclusion is permitted here. Therefore, I would reverse the finding of neglect and dismiss the neglect petition.