[914 NYS2d 105]

In the Matter of Noah Jeremiah J., a Child Alleged to be Neglected. Kimberly J., Appellant, Administration for Children's Services, Respondent.

First Department, December 21, 2010

38

## APPEARANCES OF COUNSEL

*Law Offices of Randall S. Carmel*, Syosset (*Randall S. Carmel* of counsel), for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Larry A. Sonnenshein* and *Leonard Koerner* of counsel), for respondent.

*Tamara A. Steckler, The Legal Aid Society*, New York City (*Louise Feld* of counsel), attorney for the child.

## OPINION OF THE COURT

CATTERSON, J.

In this Family Court neglect proceeding, the respondent mother challenges the finding of neglect of her son who was born HIV-positive and required antiretroviral medication administered on a strict schedule. The record establishes the effects of her mental illness and failures to administer her own medication on her ability to care for her infant son, and hence a finding of neglect based on the risk of imminent harm is supported by a preponderance of the evidence.

The mother began treatment for her mental health disorders and drug addictions in December 2001. Psychiatric reports and medical records listed her diagnoses as including major depression with psychotic features, cannabis dependence, cocaine dependence, alcohol dependence, past history of attention deficit hyperactivity disorder, and bipolar II disorder. Evaluations in her medical record documented her cocaine/crack and marijuana abuse and psychiatric history, and detailed her unstable relationships with her two sons and with the father of the two boys.

In 2006, the court entered a finding of neglect of her two sons, and by order dated March 6, 2007 placed the two boys in foster care. The court further ordered the mother to cooperate with mental health services, participate in a drug treatment program, and complete vocational and educational skills training. The service plan established for her included completion of parenting classes and a drug treatment program, random drug testing, continuous mental health services, and procurement of suitable housing, employment, and a GED.

In mid-2007, she became pregnant with Noah, the infant at issue in this case. Quarterly reports chronicle her subsequent lapses in compliance with the court order and her psychiatric treatment. She gave birth on April 9, 2008. Noah, weighing only four pounds, 14 ounces, was HIV-positive and required immediate specialized medication intervention. Accordingly, he was placed on medical hold at the hospital.

On April 15, 2008, less than a week later, the Administration for Children's Services (hereinafter referred to as ACS) filed a neglect petition in New York County Family Court on behalf of Noah alleging, inter alia, that the mother "suffers from a mental illness and/or a mental condition which impairs her ability to care for [Noah]" and that, as a result, Noah is "in danger of becoming a neglected child." An April 28, 2008 amendment also alleged that she failed to take her prescribed medications, that there was a prior finding of neglect of Noah's two siblings based on drug abuse, and that she had not complied with the court's 2007 order.

At the time the petition was filed, the mother was attending a drug treatment program, but had missed several sessions and so had not completed the program, although regular testing indicated that she had not tested positive for illegal drugs. She had not enrolled in a GED program or vocational training.

On June 18, 2008, the mother's attorney submitted a proposed order to the court pursuant to article 18-B, section 722-c of the County Law for the purpose of obtaining the services of a mental health professional for the mother, who was indigent. Following an administrative delay, the court received the mother's medical records from the mental health clinic in December 2008. In early 2009, the court rejected a proposed resolution by the parties and scheduled a pretrial conference on March 9, 2009, and a fact-finding, disposition, and permanency hearing on April 22, 2009. At the pretrial conference, the court denied the mother's request for the services of a mental health

professional to assist in preparation for trial on the grounds that her treating psychiatrist was already scheduled to testify.

At the fact-finding hearing, the mother's psychiatrist described the symptoms of bipolar mental illness. An individual diagnosed as bipolar suffers periods of major depression and hypomania which may last for weeks. During episodes of depression, an individual's sleep, appetite, energy, and ability to function are compromised. During episodes of hypomania, an individual can experience difficulty with impulsivity, and sleep, speech and concentration are affected.

The psychiatrist testified that the mother's bipolar condition made her irritable, impulsive, and likely to make poor decisions, primarily affecting her interactions with others. He established that any failure to take her medications would exacerbate her condition, making her more moody, impatient and susceptible to major depression, thus impairing her ability to care for herself and Noah.

He further testified that on two occasions the mother had stopped taking her psychotropic medications, Wellbutrin and Zyprexa—once during a three-week visit to Ohio in December 2007, and once several months later for four days following Noah's birth. He stated that when he saw her after the four days without medication, she was "distress[ed]"; however he could not ascertain how much of her reaction was attributable to her failure to take her medication rather than the fact that the baby did not go home with her. Although her mood swings were stable, he stated unequivocally that while the mother was not on medication, she would be unable to care for Noah.

The mother's psychiatrist further observed that while her medications were generally effective, "loose" or "tangential" thinking, a chronic manifestation of her condition, persisted even with periodic increases in dosage during her pregnancy. He further opined that this would affect her ability to take care of herself and Noah, "a very small, very young child who is completely dependent on her care."

An ACS child protective specialist who was assigned to the family testified as to the agency's concern that, based on discussions with the mother's clinic, she would be unable to administer Noah's antiretroviral medication on the required strict schedule. While there was some discussion among the mother and Noah's healthcare providers of arranging home support, the ACS specialist concluded that even with homemaking support or visiting nurse services, the mother's lapses in taking her

medication together with other indicators such as her difficulty waking up in the morning and keeping required appointments suggested that she would be unable to adhere to the newborn's strict medication regimen. Furthermore, although she had secured housing, she was unprepared for the baby's arrival in other respects. For example, there were no provisions at home for an infant, such as a crib or infant clothes, and her live-in boyfriend had not been cleared with ACS.

The court concluded that as a result of her mental illness, the mother's ability to care for Noah was impaired. The court entered a disposition of neglect because he was "at risk," particularly with respect to his required "strict course of medication." The court also noted its prior finding of neglect against the mother as to her two older boys. By order dated April 22, 2009, Noah was placed in the custody of the Commissioner of Social Services of New York County until completion of the next permanency hearing scheduled for September 10, 2009.

On appeal, the mother argues that ACS failed by a preponderance of the evidence to establish a causal connection between her mental health condition and any potential harm to Noah. She argues that the totality of the record supports a finding that with the appropriate services in place, Noah could have been discharged to her care without placing him at risk. Additionally, she argues that the court erred in denying her motion for appointment of an expert psychiatrist. The attorney for the child and ACS argue that the evidence supports the court's findings. For the reasons set forth below, we affirm the findings of the court.

As a threshold matter, the court's denial of the mother's motion for appointment of an expert was an appropriate exercise of its discretion. It is well established that where there is extensive medical evidence in the record, the court may decline to authorize an expert on the basis that such services are not necessary. (See Matter of Penny B. v Gary S., 61 AD3d 589, 591 [2009], lv denied 13 NY3d 705 [2009] [no demonstrated need where the court was sufficiently informed about the child's behavioral problems and had extensive medical evidence]; see also Matter of Garfield M., 128 AD2d 876, 877 [1987] [extensive evaluation and psychological examination of the appellant by the Family Court Mental Health Services rendered an additional expert unnecessary].) Here, the mother's medical records and testimony by the psychiatrist who treated her for eight years obviated the necessity for additional expert testimony.

■ Further, the court's finding of neglect was supported by a preponderance of evidence that the mother's mental illness resulted in her inability to care for Noah, putting him at immediate risk of harm. Family Court Act § 1046 (b) (1) provides that at a fact-finding hearing, "any determination that the child is an abused or neglected child must be based on a preponderance of the evidence." The Family Court Act defines a neglected child as one whose "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care." (Family Ct Act 1012 [f] [i].) Therefore, "[a] respondent's mental condition may form the basis of a finding of neglect if it is shown by a preponderance of the evidence that his or her condition resulted in imminent danger to the child[ ]." (*Matter of Jesse DD.*, 223 AD2d 929, 930-931 [1996], *lv denied* 88 NY2d 803 [1996].)

However, the court need not wait for a child to be harmed before "extending its protective cloak around [the] child." (*Matter of Cruz*, 121 AD2d 901, 903 [1986] [internal quotation marks and citation omitted].) The rationale for derivative neglect rests partly upon the proposition that when a prior finding of neglect is proximate in time to the derivative proceeding, the parent's impaired judgment is presumed to continue endangering any child in that parent's care. (*See e.g. Matter of Amber C.*, 38 AD3d 538, 540-541 [2007], *lv denied* 8 NY3d 816 [2007], *lv dismissed* 11 NY3d 728 [2008] [parents' neglect of their children due to keeping an unsafe and unsanitary home seven months prior to the derivative proceeding indicated continued impaired parental judgment]; *Matter of Andrew DeJ. R.*, 30 AD3d 238, 239 [2006] [a father's neglectful conduct in possessing drugs was sufficiently close in time to the derivative proceeding to support the court's conclusion that his parental judgment remained impaired]; *Matter of Hannah UU.*, 300 AD2d 942, 944-945 [2002], *lv denied* 99 NY2d 509 [2003] [a mother's neglect of her son due to mental illness and her continued impairment during her pregnancy justified a finding of derivative neglect of her newborn daughter]; *Matter of Kimberly H.*, 242 AD2d 35, 39 [1998] [finding of a mother's neglect due to excessive corporal punishment one month before child's birth indicates that the mother's pattern of behavior is likely to continue].)

"Imminent danger . . . must be near or impending, not merely possible" (*Nicholson v Scoppetta*, 3 NY3d 357, 369

[2004]), and "the quantum of evidence presented at a fact-finding hearing must be sufficient to prove that if the child were released to the mother there would be a substantial probability of neglect that places the child at risk" (*Matter of Jayvien E. [Marisol T.]*, 70 AD3d 430, 436 [2010] [internal quotation marks, brackets and citation omitted]). Additionally, the court is obligated to consider whether providing support services might eliminate the risk of harm to the child. (*See Nicholson*, 3 NY3d at 379.)

The record in this case establishes that the effect of the mother's mental illness together with her inability to manage her own medication is such that, if Noah was released to her care, there is a substantial probability that he would not be adequately cared for and, more specifically, would not receive his HIV medication, placing him in imminent danger. Moreover, although the mother claims that Noah should have been released to her care with home services, there is no indication that this was a viable alternative either at the time of Noah's discharge or the following year at the hearing.

The record establishes that Noah's mother suffers from bipolar mood disorder type II. The psychiatrist who has treated her since 2001 explained that without her medication, her bipolar disorder would prevent her from caring for Noah. Her psychiatrist also noted that she would have an even greater need for medication after giving birth to Noah, at which point she would be more vulnerable to an episode of either depression or hypomania. Her psychiatrist opined that even one missed dose would result in insufficient medication levels, leaving her less capable of responding to the demands of a newborn baby. He expressed doubt as to whether, even with her medications, her condition was resolved to the extent that she would have the capacity to take care of Noah.

Petitioner ACS and the attorney for the child testified as to concerns that because the mother suffered from bipolar disorder and had a history of noncompliance with her medications, she would either not take her medications, rendering her unable to care for Noah, or she would fail to administer Noah's medications according to the requisite strict schedule. Her psychiatrist testified, and the mother does not dispute, that she failed to take her medications for two periods of several days at a time. These two incidents, close in time to Noah's birth, suggest a substantial probability that she will repeat this behavior and either not take her own medication, rendering her incap-

able of caring for Noah, or not administer Noah's medication on a regular basis.

The dissent's observation that "if bipolar disorder and occasional failures to follow up on medication were enough to support a finding of neglect, many more children would require foster care" is not persuasive. The dissent fails to take into account Noah's exceptional fragility and that newborns must be provided with the maximum protection available. (*Matter of Kimberly H.*, 242 AD2d at 39 ["'(a) new infant is the most vulnerable of creatures, utterly unable to either defend (himself) or report mistreatment"].) At the time of the petition, Noah was a low-birth-weight baby battling HIV and required extraordinary care including administration of his antiretroviral medication on a strict schedule. Under these circumstances, even an "occasional" failure to follow up on medication would have been harmful. Furthermore, a year later, although the baby's prognosis had improved, the mother's circumstances had not changed. At the time of the hearing, she had no housing, had not enrolled in the court-ordered GED or vocational training, and the record is devoid of any indication that the effects of her mental illness had been resolved or that compliance with her medication had improved such that she could care for the baby.

Nor does the fact that the mother has passed several drug tests help her case. We note that participation in a treatment program does not by itself establish that a mother with a history of neglect has successfully corrected the harmful behavior pattern. This is particularly true where, as occurred here, the mother has not successfully completed prior treatment programs. (*See e.g. Matter of Hannah UU.*, 300 AD2d at 944-945 [evidence of a mother's therapy and other services for mental illness during the eight weeks prior to her daughter's birth did not overcome presumption that her mental illness impaired her parental judgment]; *Matter of Kimberly H.*, 242 AD2d at 39 [a mother's enrollment in parenting classes did not overcome the presumption that her pattern of inflicting excess corporal punishment would continue].) This Court in *Matter of Kimberly H.* reasoned that to permit the infant in that case to return to the mother's home was "tantamount to using a defenseless baby to test whether the preventive social services provided to the parent have succeeded in changing the parent's patterns of conduct." (242 AD2d at 40.) The same is true here.

The mother's participation in therapy groups, cooperative demeanor, and honesty are commendable. However, these efforts

simply cannot compensate for her lack of ability to care for an infant son with special needs and her own inability to comply with a treatment plan for her own mental health problems.

Accordingly, the order of the Family Court, New York County (Rhoda J. Cohen, J.), entered on or about April 22, 2009, which, to the extent appealed from as limited by the briefs, determined after a fact-finding hearing that respondent mother neglected the subject child, should be affirmed, without costs.

SAXE, J.P. (dissenting). On this appeal, we consider allegations of child neglect in the context of the mother's psychological and emotional problems. Based on my evaluation of the record, I believe that petitioner Administration for Children's Services (ACS) did not prove by a preponderance of the evidence that the subject child, Noah J., is a neglected child. While the record establishes that respondent mother Kimberly J. suffers from bipolar disorder, and that *in the past* her mental and emotional condition created imminent risk for her children, ACS failed to demonstrate by a preponderance of the evidence that at the time of the hearing involving Noah, she was unable to care for him without placing him at imminent risk, particularly if appropriate social services assistance had been made available to her. Accordingly, I respectfully dissent.

Under the Family Court Act, a neglected child is one "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship" (Family Ct Act § 1012 [f] [i] [B]). In a fact-finding hearing, a determination that a child is neglected must be based on a preponderance of the evidence (Family Ct Act § 1046 [b] [i]). In this instance, the question is whether ACS proved by a preponderance of the evidence that Noah was in imminent danger of physical impairment as a result of his mother's failure to provide him with proper supervision.

Noah was born on April 9, 2008, HIV-positive and with a low birth weight of four pounds, 14 ounces. On April 15, 2008 ACS filed a neglect petition against Kimberly, alleging that she had failed to follow the mandates of a prior dispositional order dated June 26, 2007, issued as the result of a neglect finding regarding her two older sons, based on her admission that she used marijuana daily in her sons' presence. The specific provisions of the 2007 order with which Kimberly allegedly failed to comply were completion of a drug treatment program, attendance at a GED program and attendance at a vocational training program.

When the Family Court initially considered the application for removal pursuant to Family Court Act § 1027 on April 16, 2008, ACS's child protective specialist, Nichola Martin, testified that Kimberly's treating psychiatrist did not believe Kimberly could consistently administer Noah's necessary regimen of medication, because she was not fully compliant with taking her own psychiatric medication. It was specialist Martin's understanding (subsequently disproved) that Kimberly had not been taking her psychiatric medications at all during the latter part of her pregnancy and up to the date of the hearing. According to Martin's testimony on this point, Kimberly had requested to be taken off her psychotropic medications because of the pregnancy, and while her psychiatrist did not agree, he nevertheless "adhered" to the request and took her off the medication.

Martin also testified that Kimberly did not then have the necessary provisions for the child, such as a crib or infant clothes, and suggested that in addition, before the child could be discharged to her home she would need to go back on her medications, to receive additional parenting training to address the child's medical needs, and to receive supporting services in the home. No explanation was offered as to why no homemaking and visiting nurse services had been offered or put in place when Kimberly was being discharged from the hospital to help enable her to care for Noah.

While the Family Court observed that "the A.C.S. has not made reasonable efforts to offer services to prevent the [r]emand of this [c]hild," it nevertheless remanded the infant to ensure his safety, emphasizing the lack of provisions for the baby. It further directed the agency to discuss providing homemaking services and visiting nurse services before the adjourn date.

At the fact-finding hearing held on April 22, 2009, ACS presented evidence that Kimberly has been diagnosed with a bipolar mood disorder causing her to suffer from "major mood swings" and "impulsivity." She has been under the care of psychiatrist Warren Ng since 2001, who has successfully treated her with the antidepressant Wellbutrin and the mood stabilizer Zyprexa since that time. Dr. Ng explained that while Kimberly's initial diagnosis in 2002 was a major depression with psychotic features, he had never known her to hallucinate, and she had not needed any psychiatric hospitalizations. Rather, the bipolar disorder sometimes caused her to experience "loose" or "tangential" thinking, which the prescribed medications generally effectively treated.

Dr. Ng testified that failure to take her medication would impair Kimberly's ability to care for her newborn. When specifically asked if she could have cared for the newborn infant on her own without assistance, he testified that she could not. However, he did not offer any views as to whether she would be able to do so if provided with homemaker or visiting nurse assistance. He acknowledged Kimberly's full cooperation with and participation in her treatment. He said she is "aware of her challenges and . . . definitely tries to do her very best." He reported that she is fully involved in her individual and group therapy treatment programs, and was attempting to comply with all the requirements imposed on her. She is always polite, behaves appropriately, is properly dressed, uses proper hygiene, and keeps her appointments. Importantly, he reported that she informs him when she notices that the dosages of her medications may need adjustment in order to effectively control her mood swings and impulsivity.

Dr. Ng testified that Kimberly's mood swings were stable at the time of Noah's birth, and that when he met with Kimberly several times after Noah's birth, her moods remained stable. However, he also testified to two occasions when Kimberly went off her medications. When she came in to his clinic on April 16th, four days after her discharge from the hospital, she informed him that she had not taken her psychiatric medications for those four days, explaining that she had gone home from the hospital without a supply of the medications. He acknowledged that at that time, when the decision was made for Noah to be kept in the hospital while Kimberly's abilities and level of functioning were further evaluated, Kimberly had understandably experienced fear, anxiety and distress. He also reported one prior occasion when, following a three-week visit to Ohio in December 2007, Kimberly informed him when she returned that she had run out of medication while on her trip. Neither situation seems to have involved willful noncompliance with taking her medication; indeed, all the evidence established that Kimberly was generally compliant with her medication. Dr. Ng did not mention, during his testimony, the assertion made by Nichola Martin during the previous hearing, in which she reported that Dr. Ng had acceded to Kimberly's request to be taken off the medication during the latter part of her pregnancy.

Social worker Vanessa Palma, who had been assigned to Noah's older brothers' case and handled Noah's case as well, explained her initial concerns about Kimberly's ability to care

for Noah when he was born, knowing that he would require a strict medication schedule due to his HIV-positive status at birth. Because Kimberly had not always followed through with her own medication, Palma expressed her belief that even with homemaker services it would not be certain that Kimberly would ensure that Noah received the medication on the required strict schedule. However, she did not support that belief with facts justifying her conclusion.

Palma also described Kimberly as having difficulty interacting with her two older sons at the same time on scheduled visits with them. However, she admitted that Kimberly was "consistent" with visits with her two older sons.

As to Kimberly's failure to complete the service plan prepared for her in the context of the 2007 dispositional order, which was the initial ground for the neglect petition, Palma specified that as of the date of Noah's birth, Kimberly still had not completed her drug treatment program, did not have a stable income, and had not enrolled in either a GED program or vocational training. As to the housing Kimberly had obtained, the social worker voiced concern that she lived in a one-bedroom apartment with her boyfriend, who had not been cleared by ACS.

Importantly, however, Kimberly had neither dropped out of nor failed the drug treatment program, and had not suffered a relapse. Rather, her participation in the program had simply been extended because she had missed several sessions between December and January—that is, during her trip to Ohio. She continued to be subject to weekly drug tests since her enrollment in the drug treatment program in the fall of 2007, and she consistently tested negative for drugs. Moreover, Kimberly had obtained Medicaid and public assistance. And, while she had not yet enrolled in GED and vocational training programs, Kimberly had explained to Palma that she wanted to focus on one thing at a time, and was at that time focusing on the drug treatment program. The social worker also acknowledged that while Kimberly sometimes missed appointments, she informed the social worker in advance.

The petition was amended on April 28, 2008, so as to also charge that Kimberly was noncompliant in taking her prescribed medications, in that she admitted to not having taken her medication for at least four days.

The evidence presented to the Family Court painted a portrait of a woman suffering from bipolar disorder who understands and does all that she can to cooperate in the treatment of her

psychiatric disorder, including participating in individual and group therapy programs. She has been successful at treating her drug problem, having tested negative for drugs ever since she began drug treatment. According to all the testimony, she is polite, keeps appointments or notifies the appropriate professional if she cannot, and is neither oppositional nor confrontational. Her delay in completing the drug treatment program does not reflect negatively on her in any way, and I fail to see how her failure to enroll in GED or vocational training programs reflects badly on her parenting ability. The only negative assessment of her as a parent is the social worker's bare assertion that she has trouble interacting with both of her older boys at the same time during their weekly visits.

As to the evidence regarding the two occasions when Kimberly neglected to take her daily medications, having failed to ensure she had the medications she needed, they fall short of justifying the neglect finding. Indeed, on those two occasions, she thereafter notified her psychiatrist of the problem, and rectified the situation. There was no evidence at all that Kimberly's actual mental, emotional, or psychological condition during the relevant period of time was negatively affected in any way, with the exception of Dr. Ng's assertion that Kimberly, understandably, experienced fear, anxiety and distress when she was informed that her baby was not being discharged to her home.

The doubts expressed by Dr. Ng, echoed by Vanessa Palma and Nichola Martin, as to Kimberly's ability to follow Noah's medication regimen, were not sufficiently supported by evidence to permit their adoption by the court. The two discrete occasions on which Kimberly failed to ensure she had the medications she needed do not support a conclusion that she would fail to give Noah his medications. To the extent these expressed doubts may have been based on the reasoning that any failure by Kimberly to take her medications could, in turn, cause Kimberly to experience mood swings and impulsivity, which could undermine her ability to provide the necessary care for Noah, the supposition that Noah could be at imminent risk of harm is simply too attenuated to be valid. It is quite possible that Dr. Ng, Vanessa Palma, and Nichola Martin might have had personal experience with Kimberly that justified their concerns about her ability to competently care for Noah; however, the information they provided to the court, in the form of their testimony and reports, failed to establish grounds for a finding that Noah would be placed in imminent risk of

harm if left in his mother's care. The support they provided for their expressed doubts boils down to the two explained and unique incidents of failure to take medication. In and of themselves, those two incidents are an insufficient basis for concluding that it was likely that Kimberly's care would place Noah in imminent danger of physical harm.

" 'A finding of neglect should not be made lightly, nor should it rest upon past deficiencies alone' " (*Matter of Jayvien E. [Marisol T.]*, 70 AD3d 430, 435 [2010], quoting *Matter of Daniel C.*, 47 AD2d 160, 164 [1975]). Imminent danger must be near or impending, not merely possible (*Jayvien E.*, 70 AD3d at 436). Only where it is shown, by a preponderance of the evidence, that a respondent's mental condition resulted in imminent danger to the child should respondent's mental condition form the basis for a finding of neglect (*id.* at 435). The showing here of Kimberly's bipolar disorder and the two short-lived incidents of failure to take her medication were insufficient to establish that her psychiatric disorder would be likely to impede her ability to care for her child, resulting in imminent risk of harm to the child if placed with her. Indeed, if bipolar disorder and occasional failures to follow up on medication were enough to support a finding of neglect, many more children would require foster care.

Moreover, even if the evidence had established by a preponderance of the evidence that Kimberly's psychiatric condition might have made it difficult for her to provide the necessary care for newborn Noah if left entirely on her own, there was a total lack of evidence showing that she could not properly care for Noah if she received daily homemaker and visiting nurse assistance (*see Matter of Daryl R.L.*, 67 AD2d 948 [1979]). Although such assistance is authorized by statute and regulation (*see* Family Ct Act § 1015-a; 18 NYCRR 460.2), and although the Family Court initially directed ACS to discuss providing Kimberly with such services, the record fails to reflect that a reasonable effort was made to do so. Notably, while Dr. Ng expressed the view that Kimberly could not handle caring for Noah alone, his opinion seems to have been based on the assumption that she would take the infant home with no social services assistance in place. He was not questioned regarding the nature and extent of services that in his view would enable Kimberly to provide proper care to her infant. Indeed, no witness explained that Kimberly could not successfully care for her infant without placing him at imminent risk if given the assistance of homemaker and visiting nurse services.

Nor was it established that some other aspect of Kimberly's behavior would place Noah at imminent risk in any manner aside from the claimed possibility that Kimberly would neglect to give him his medication. Unlike the circumstances presented when the 2007 neglect order was filed against her, here it was established that Kimberly was drug-free and fully cooperative with the drug treatment process; her former drug problem was characterized as "in remission." She has substantially complied with the guidance offered by ACS in the ongoing effort to improve her parenting abilities. She had living quarters, and to the extent ACS had not determinated whether her boyfriend's presence was acceptable, there was no evidence indicating that her boyfriend's presence could reflect negatively on Kimberly's parenting ability. Her failure to obtain her GED or vocational training does not indicate a poor attitude or uncooperativeness on Kimberly's part, but rather resulted from her realistic decision to focus on one endeavor at a time. Nor does that choice of focus impact in any way her parenting ability. Finally, the failure to prepare her home for the infant, as attested to on April 16, 2008, was not further explained or discussed at the fact-finding hearing. If that failure was a reflection of a more general inability on Kimberly's part, ACS should have presented testimony establishing such a fact. As the evidence stands, it does not permit an inference that Kimberly was unable to undertake normal parental responsibilities.

Cases in which the evidence has established that the parents' mental and emotional state posed an imminent risk of harm to their children have made much stronger showings than the case presented here. An illustration of such a case is found in *Matter of Kayla W.* (47 AD3d 571 [2008]), where this Court considered a claim of child neglect relating to the parent's mental illness. We affirmed a neglect finding where a mother with a major depressive disorder exhibited "extrem[e] agitat[ion]," "low frustration tolerance" and lack of insight into her illness and the need for treatment (47 AD3d at 571). She cursed at hospital staff and punched a wall so hard she visibly hurt her hand, necessitating sedation and restraint (*id.*). She also exhibited explosive angry outbursts in front of her child, who was visibly upset (*id.* at 572). The mother was uncooperative with therapists, did not want to discuss her symptoms and her anger, and her actions made it likely the child would be at risk of imminent harm (*id.*).

Similarly, in *Matter of Caress S.* (250 AD2d 490 [1998]), this Court affirmed a neglect finding where a mother adamantly

refused to take her medication, even during supervised visits with her child, despite her "evident stress." The mother exhibited "bizarre behavior" and "erratic temperament" and refused to attend recommended psychiatric treatment sessions (*id.* at 490).

Kimberly's situation contrasts sharply with these. Unlike the mother in *Kayla W.*, Kimberly acknowledged that she suffered from a mood disorder and made every effort to get help. Kimberly did not display angry or violent behavior and there was no evidence of her requiring restraints or sedation. Indeed, Dr. Ng acknowledged that her mood swings were stable during the repeated occasions that he met with her after Noah's delivery, so there is no indication that her mood swings would pose an imminent risk of harm to Noah. Dr. Ng described Kimberly as "honest" and "forthright," always very "polite and appropriate," and said she voluntarily asked for her dosages to be adjusted when she felt her symptoms were not adequately controlled. Unlike the mothers in *Kayla W.* and *Caress S.*, Kimberly cooperated with her treatment. She has a history of good relationships with her therapists and regularly attended group and individual therapy, and was "very good with keeping her appointments." In sum, based upon the evidence presented, it is my view that the evidence failed to establish a likelihood of an imminent risk of harm, and accordingly, I would reverse the finding of neglect.

RENWICK, RICHTER and ABDUS-SALAAM, JJ., concur with CATTERSON, J.; SAXE, J.P., dissents in a separate opinion.

Order, Family Court, New York County, entered on or about April 22, 2009, affirmed, without costs.