(February 9, 2010)

■ In the Matter of JAYVIEN E., a Child Alleged to be Neglected. MARISOL T., Appellant; COMMISSIONER OF THE NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. [894 NYS2d 52]—

Order of disposition, Family Court, New York County (Jody Adams, J.), entered on or about April 8, 2008, which, upon a fact-finding determination that respondent mother neglected the subject child, inter alia, placed the child with his maternal grandmother pending the completion of the next permanency hearing, unanimously reversed, on the law and the facts, without costs, the findings of neglect vacated and the neglect petition dismissed.

On December 14, 2006, at approximately 11:15 A.M., respondent, who was then 19 years old, gave birth to a son, Jayvien E., at Beth Israel Medical Center (BIMC). After delivery, a nurse came to respondent's room and began to push on her stomach. Respondent asked the nurse to stop. When the nurse continued to push on her stomach, respondent became upset and allegedly yelled at the nurse to stop. That evening, at approximately 10:30 P.M., respondent called and requested that an unwanted visitor, the baby's father, be removed from her hospital room. Security had to be called to remove Jayvien E.'s father from respondent's room.

The next morning, at approximately 6:15 A.M., a medical student overheard respondent calling her baby "greedy" and "too much." As a result, BIMC conducted a psychiatric consultation of respondent. Dr. A. Newfield, a psychiatrist, prepared a report. Dr. Newfield stated that when he first encountered respondent, she was in bed holding and feeding her son, and she appeared fairly groomed, well-related with appropriate eye contact, seemingly reliable and cooperative. Dr. Newfield's report noted that respondent had an "unclear" psychiatric history.

During his second visit with respondent later that same day, Dr. Newfield was accompanied by another doctor, Dr. Kato. When the two first arrived, respondent was asleep. Dr. Newfield recounted that after being awakened, respondent appeared less well-related, that she was ignoring the conversation at times and was uncooperative. He recommended that the New York City Administration for Children's Services (ACS) be contacted to determine respondent's history and to evaluate what should be done with her son. Dr. Newfield further recommended that respondent be referred to outpatient treatment, stating "Axis I R/O Borderline MR, R/O intermittent explosive D/O, R/O Bipolar, R/O Psychotic D/O."

Dr. Kato also prepared a report, in which he stated that during his interview with respondent, she became easily agitated and uncooperative. Dr. Kato further reported that respondent had vague thoughts, poor insight and judgment. Dr. Kato's report states "R/O depression/anxiety" and that he was "concerned about her ability to safely . . . care for the baby." Neither Dr. Newfield nor Dr. Kato indicated in their reports how long they spent interviewing respondent.

The record also contains a number of BIMC postpartum daily patient care flow sheets signed by registered nurses tracking respondent's behavior after the birth of her son. Two of these sheets, prepared on December 14, 2006, for the day and night

shifts, state that respondent's mood was appropriate, and that she was cuddling and talking to her son and performing baby care. Another flow sheet similarly described respondent's interaction with her son during the night shift of December 15, 2006. Further, the flow sheet dated December 16, 2006, for the day shift, noted the identical observations. The record also contains a progress note titled "Psych F/U," which states that respondent was observed on December 15, 2006, at approximately 9:15 P.M., and that she did "not display any psychiatric symptoms at present."

The medical records from BIMC assert that respondent has a history of behavior problems including aggressive outbursts, depression, and suicidal ideation, and that she has been prescribed medication including Wellbutrin and Risperdal. The BIMC reports indicate that she had been hospitalized and evaluated previously at Saint Vincent's Hospital and had received counseling services. However, the record does not contain any of respondent's medical records from Saint Vincent's Hospital. Respondent does acknowledge that she has had periods of depression and that she has been hospitalized five or six times.

On December 15, 2006, ACS received a mandated oral report transmittal (ORT) from a social worker indicating that ACS should investigate respondent. The ORT asserts that "safety factors" were involved because respondent suffered from a mental illness or disability that impaired her ability to care for Jayvien E. ACS assigned Child Protective Specialist Karina Vargas to investigate the allegations.

Vargas commenced her investigation by speaking to her supervisor, contacting the social worker who was the source of the ORT and having a 15 minute telephone conversation with respondent. On December 15, 2006, at approximately 6:00 P.M., Vargas telephoned respondent's hospital room and asked her why she had called her baby "greedy." Respondent explained to Vargas that after she had fed her son, he started to cry as if he wanted to be fed again. Respondent then picked up her child and called him "greedy." Respondent told Vargas that she did not mean it in a bad way.

Vargas also questioned respondent about why she had yelled at a nurse shortly after delivering Jayvien E. Respondent explained to Vargas that she told the nurse to stop pressing on her stomach because she was not feeling well and was still sore from the birth of her son. She became angry after the nurse had ignored her requests and continued to press down on her stomach. Respondent also told Vargas that she was not an angry person, however, sometimes when she gets upset, she would throw things, but not directly at people.

In a petition dated December 18, 2006, ACS asked the Family Court to find that Jayvien E. was a neglected child. ACS's petition asserts it was necessary to remove Jayvien E. from respondent's custody on December 16, 2006, without a court order, because his physical, mental or emotional well-being had been impaired or was in imminent danger of becoming impaired due to his mother's mental illness. The neglect petition specifically alleges that after respondent gave birth she: (1) exhibited bizarre behavior; (2) was not nurturing toward the child; (3) would not look at the child; and (4) had called the baby "greedy" when her son was hungry. The petition further asserts that after a psychiatric evaluation of respondent, it was revealed that she suffers from intermittent explosive disorder and that she has borderline cognitive abilities with poor insight and judgment. The petition also asserts that respondent failed to be forthcoming about the medications she had been prescribed and that she used to take antidepressants, antipsychotics, and mood stabilizers.

The Family Court conducted a fact-finding hearing on June 13, 2007, August 10, 2007, October 5, 2007 and March 14, 2008. The court heard testimony from two witnesses: Vargas, who was the assigned caseworker and the person who signed the neglect petition, and respondent's expert witness, psychologist Dr. Peter F. Wolf.

At the fact-finding hearing, Vargas admitted during her cross-examination that Jayvien E.'s physical or emotional well-being had not been impaired, nor was it in imminent danger of being impaired, by respondent asking the nurse to stop pressing on her stomach or by her calling him "greedy." Vargas also admitted that Jayvien E.'s physical and emotional well-being had not been impaired, and had not been in imminent danger of being impaired, by the fact that respondent had been prescribed antidepressant medication.

When questioned regarding what information led her to believe that respondent had been physically violent, Vargas stated that she had reviewed some domestic incident reports describing altercations between respondent and respondent's mother, Jayvien E.'s maternal grandmother. In particular, Vargas stated that according to a February 2005 domestic incident report, there had been an altercation between respondent and her mother which involved some pushing, a verbal argument and a chair being thrown. However, Vargas admitted that the February 2005 report failed to state who pushed whom and that the report only indicated "that somebody threw a chair at someone."

Vargas never contacted Dr. Newfield although she admitted that speaking to him was important. Moreover, Vargas admitted she never ascertained the identity of the nurse who had pushed on respondent's stomach, nor obtained her account of the interaction. Vargas testified that Dr. Newfield's report was the document upon which she based some of the allegations contained within the negligence petition. However, after being asked to show the court where in Dr. Newfield's report he diagnosed respondent with having intermittent explosive disorder, Vargas identified the portion of the report which stated "Axis I . . . R/O Intermittent explosive D/O." When asked what the quoted phrase meant, Vargas admitted that she "[did]n't know for sure." When asked to identify the source of the diagnosis that respondent had borderline cognitive abilities, Vargas admitted she did not see anything in Dr. Newfield's report that diagnosed respondent with borderline cognitive abilities.

According to respondent's expert witness, a psychologist, Dr. Peter F. Wolf, "R/O" means "rule out." It is used where a diagnosis is a "possibility," and indicates that more information is required to "rule it out or rule it in." Dr. Wolf testified that Dr. Newfield's report contained "no diagnosis that's ruled in." Dr. Wolf recounted that he met with respondent for approximately two hours. During a psychological evaluation of respondent, he performed two psychological tests: thematic apperception test and the Rorschach test. Dr. Wolf stated that based upon his evaluation as to whether respondent had intermittent explosive disorder, he determined that "[t]here was no indication of that and there was no indication that at the time she was seen in [BIMC] at least from the hospital's report that there was anything of that nature."

Although Dr. Wolf did not perform an IQ test for respondent, he stated "she was able to communicate coherently" and that she had a good awareness of reality. When asked if respondent had any psychological condition that would negatively impact her ability to parent her son, Dr. Wolf testified that "I think that she's young she's had a rough life . . . she needs to learn . . . to grow[ ] into being a parent . . . I don't see that reaches the point where I would be concerned about neglect or abuse." However, Dr. Wolf admitted that he did not review respondent's medical records regarding her prior hospitalizations.

On December 12, 2008, the Family Court rendered an oral decision holding Jayvien E. was a neglected child whose physical, mental and emotional condition was in imminent danger of becoming impaired as a result of respondent's failure to exercise a minimum degree of care. The court expressed concern over

the altercation between respondent and Jayvien E.'s father, noting that security had to be called to resolve the situation. The court found that Dr. Wolf's testimony was of limited value because he did not examine respondent's complete psychiatric history and had placed undue reliance on respondent's self-reporting. The court concluded that given these deficiencies in Dr. Wolf's testimony, it was insufficient to rebut ACS's direct case.

The court held that the evidence established a causal connection between respondent's condition and actual and potential harm to her child, based upon "the chronicity and durability of [respondent's] behavior symptoms[,] . . . [her] chronic history of the pattern of noncompliance with treatment, medication, and follow-up treatment recommendations . . . [and that] [t]here is no evidence in the record that she understands the nature of her own behavior and how it could affect her ability to safely care for a child." The court noted that respondent had been "psychiatrically hospitalized" at Saint Vincent's Hospital in 1999, which resulted in her being discharged with a prescription for psychiatric medication, and that she was considered to be a patient at high risk.

Citing a "November 2002 report in the Beth Israel records of aggression in [respondent's] day treatment that led to a concern for the safety of others in her program," the court found a "nexus between respondent's symptoms and her parental capacity is her long standing pattern of aggressive acting out." The Family Court held that an adverse inference against respondent was warranted due to her failure to testify at the fact-finding hearing. Ultimately, the court concluded that respondent's chronic aggressive behavior "would pose a risk for a vulnerable, young, dependent child in her care" and ordered that Jayvien E. be placed temporarily in the custody of his maternal grandmother.

We reverse. "A finding of neglect should not be made lightly, nor should it rest upon past deficiencies alone" (*Matter of Daniel C.*, 47 AD2d 160, 164 [1975]). The Family Court Act defines "neglected child" as a child, less than 18 years old, "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his [or her] parent or other person legally responsible for his [or her] care to exercise a minimum degree of care" (Family Ct Act § 1012 [f] [i]). "A respondent's mental condition may form the basis of a finding of neglect if it is shown by a preponderance of the evidence that his or her condition resulted in imminent danger to the child[ ]" (*Matter of Jesse DD.*, 223

AD2d 929, 930-931 [1996], *lv denied* 88 NY2d 803 [1996]; *see also* Family Ct Act § 1046 [b] [i]).

Before rendering a finding of neglect, Family Court Act § 1012 (f) (i) requires the court to determine whether there is proof of actual or imminent danger of physical, emotional or mental impairment to the child. Indeed, a family court is required to: "focus on serious harm or potential harm to the child, not just on what might be deemed undesirable parental behavior. 'Imminent danger' reflects the Legislature's judgment that a finding of neglect may be appropriate even when a child has not actually been harmed . . . Imminent danger, however, must be near or impending, not merely possible" (*Nicholson v Scoppetta*, 3 NY3d 357, 369 [2004]).

Expert testimony or a definitive psychiatric diagnosis is not required to show a parent suffers from a mental illness because "the consequences of the proceedings are temporary rather than permanent" (*Matter of Zariyasta S.*, 158 AD2d 45, 48 [1990]; *see also Matter of Caress S.*, 250 AD2d 490 [1998]). However, the quantum of evidence presented at a fact-finding hearing must be "sufficient to prove that if the child [were] released to the mother there [would be] a substantial probability of neglect" that places the child at risk (*Matter of Baby Boy E.*, 187 AD2d 512 [1992] [internal quotation marks and citation omitted]; *see also Matter of Danielle M.*, 151 AD2d 240 [1989]; *Matter of Eugene G.*, 76 AD2d 781 [1980], *appeal dismissed* 51 NY2d 878 [1980]).

Here, the record contains no evidence sufficient to support the hearing court's finding of "a link or causal connection between the basis for the neglect petition and the circumstances that allegedly produce the child's impairment or imminent danger of impairment" (*Nicholson v Scoppetta*, 3 NY3d at 369). Assuming the truth of ACS's factual assertions regarding respondent's actions during her hospitalization at BIMC, that she had been hospitalized on prior occasions, and that she had been prescribed medications, no inference can be fairly drawn that anything in her history impaired or placed her son "in imminent danger of becoming impaired" (Family Ct Act § 1012 [f] [i]).

ACS Child Protective Specialist Vargas testified that the report prepared by Dr. Newfield was the document upon which she based some of the allegations contained within the negligence petition. However, the negligence petition's assertions that a psychiatric evaluation was performed upon respondent and that it revealed she suffers from intermittent explosive disorder and borderline cognitive abilities with poor insight and

judgment find no support in any of the testimony presented at the fact-finding hearing. Indeed, Dr. Wolf's unrefuted testimony establishes that there was no diagnosis in Dr. Newfield's report.

Given the fact that the BIMC records contain conflicting observations of respondent's postpartum behavior, we find that these records fail to provide clear evidence that respondent's suffers from mental illness that affects her ability to care for her son (*compare Matter of Kazmir K.*, 63 AD3d 522, 523 [2009]). Further, ACS failed to produce a single witness at the fact-finding hearing that observed respondent's allegedly bizarre behavior (*see Zariyasta S.*, 158 AD2d at 48). Thus, the evidence produced by ACS failed to provide the quantum of proof necessary to support the Family Court's conclusion that Jayvien E. would be at immediate risk if placed in respondent's custody.

We find that the record provides no support for the Family Court's conclusion that respondent has engaged in chronic aggressive behavior that "would pose a risk for a vulnerable, young, dependent child in her care." The November 2002 report does state that respondent's day treatment program was concerned that her aggressive behavior presented issues of safety of others in her program. However, this report is too vague and too far removed to establish a " 'causal connection between the basis for the neglect petition and the circumstances that allegedly produce the child's impairment or imminent danger of impairment' " (*Matter of Tequan R.*, 43 AD3d 673, 678 [2007], quoting *Nicholson v Scoppetta*, 3 NY3d at 369).

Although the record does show there have been instances of domestic violence between respondent and her mother, the person to whom the Family Court gave temporary custody of Jayvien E., and between respondent and the baby's father, there is no evidence that respondent was the aggressor in any of these altercations. The February 2005 domestic incident report between respondent and Jayvien E.'s maternal grandmother which states that "someone threw a chair at someone" is also too vague and too far removed to provide evidence of imminent danger to the physical, emotional or mental condition of Jayvien E. Thus, the record fails to show that respondent's behavior constituted conduct toward her son that was of a "serious nature requiring the aid of the court" (Family Ct Act § 1012 [f] [i] [B]).

The Family Court was entitled to draw the " 'strongest negative inference' " against respondent from her failure to testify at the fact-finding hearing (*Matter of Devante S.*, 51 AD3d 482 [2008], quoting *Matter of Nicole H.*, 12 AD3d 182, 183 [2004]; *see also Matter of Nassau County Dept. of Social Servs. v Denise*

*J.*, 87 NY2d 73, 79 [1995]). This inference notwithstanding, we find that ACS failed to prove by a preponderance of the evidence that respondent mother has a mental illness that had impaired her infant son, or that her mental illness placed him in imminent danger of becoming impaired, or posed to Jayvien E. an imminent risk of harm.

Therefore, the finding of neglect should be vacated and the petition dismissed. Concur—Gonzalez, P.J., Friedman, Moskowitz, Renwick and DeGrasse, JJ.