[49 NYS3d 374]

In the Matter of RUTH JOANNA O.O., a Child Alleged to be Neglected. MELISSA O., Appellant; ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent.

First Department, February 28, 2017

---

**APPEARANCES OF COUNSEL**

*Steven N. Feinman*, White Plains, for appellant.

*Zachary W. Carter, Corporation Counsel*, New York City (*Emma Grunberg* and *Fay Ng* of counsel), for respondent.

*Tamara A. Steckler, The Legal Aid Society*, New York City (*Susan Clement* and *Kristen Calabrese* of counsel), Attorney for the Child.

### OPINION OF THE COURT

Tom, J.P.

In this child protective proceeding, appellant Melissa O. (the mother) appeals from the finding of the Family Court that she neglected her three-month-old baby girl. After being discovered at 3 a.m. walking in the middle of a road in Texas, suffering from delusions and talking to herself while her infant daughter was left in the front seat of a vehicle stopped somewhere on the road, the mother was hospitalized in a Texas psychiatric ward. Thereafter, the mother, due to her abnormal, aggressive and threatening behavior, was examined by two psychiatrists in New York who determined she was delusional and assessed her as suffering from psychosis. Although she was prescribed medication for her condition, the mother never acknowledged her serious mental health condition and refused to take the medication. In addition, the mother's unfounded fear that her

infant daughter had been raped led her to repeatedly "check" the child's physical condition and then make an unnecessary trip to the hospital.

Because a preponderance of the evidence in the record supports the finding that the mother's untreated mental condition exposed the child to a substantial risk of harm (Family Ct Act § 1046 [b] [i]; *see Matter of Isaiah M. [Antoya M.]*, 96 AD3d 516, 517 [1st Dept 2012]), we affirm.

## I. Facts

On May 16, 2013, the Administration for Children's Services (ACS) filed a neglect petition against the mother alleging, inter alia, that while the mother was hospitalized from May 4 to May 9, 2013 at Green Oaks Hospital in Texas, she was diagnosed with severe mood disorder with psychosis and postpartum depression, refused to take her prescribed medication (Risperdal), and was referred for further mental health services. The petition alleged that the mother suffered from a mental illness that impaired her ability to care for the child, and had placed the child at imminent risk of harm.

Before a hearing could be held, by order dated May 16, 2013, Family Court temporarily placed the child with the maternal aunt but permitted the mother to reside in the same home provided she not be left alone with the child.

At the fact-finding hearing, the court received in evidence an Office of Children and Family Services intake report, dated May 13, 2013, called in by Julie Burkes, a child protective worker at the Department of Family and Protective Services in Plano, Texas. The report stated that on May 3, 2013, the mother was found walking in the middle of a Texas road, talking to herself. The mother stated that she had killed her husband, that she and her daughter were "the devil," and that she also was Jesus's wife. At the time of those statements and observations, the child was found in the front seat of the mother's car. The mother was "extremely delusional and hyper religious," and was taken to a "mental health facility," where she remained until May 9, 2013, but was "non-compliant" and "refused medications."

During the mother's hospitalization in Texas, her cousin, who lived in the area, was called to take the child. Upon her release, her sister from New York picked her up and subsequently the mother and child returned to New York.

The court also received in evidence medical records from New York City's St. Barnabas Hospital (SBH) pertaining to the

mother's treatment there on May 11 and 12, 2013. According to those records, around noon on May 11, 2013, one day after returning from Texas, the mother walked into the SBH emergency room with the child, and the mother's sister, asking that the child "be check[ed]." The mother presented with "erratic behavior." Specifically, she was "screaming" and told triage personnel that she had been raped while in a psychiatric hospital in Texas. Medical personnel were unable to obtain her vital signs due to her "aggressive" behavior.

At around 12:50 p.m., the mother told medical personnel in the adult emergency department that a "[F]ree [M]ason kill[ed]" and "raped" "my baby," and thus the child needed to be medically examined. The mother also stated that she herself was raped by a "Free Mason" and she wanted to be tested for sexually transmitted diseases. She "was acting irrationally, screaming, and [she] want[ed] to walk out" of the hospital with the child. She also exhibited "threatening behavior" and was assessed as suffering from "[p]sychosis" and constituting a "threat to staff and other patients," such that she had to be "physically restrained" and sedated with Haldol and Versed by injection. A psychiatric evaluation was ordered for the mother, and the child was taken to the pediatric unit.

At around 1:35 p.m., an emergency department physician, Jean Dorce, spoke to the mother's sister, who stated, inter alia, that the mother had been stopped by police in Dallas, Texas and brought to a hospital, where she was diagnosed with an "unknown" psychiatric condition and released with a prescription for medication. The mother's sister also stated that the mother had returned to New York from Dallas on the night of May 10, 2013.

During a psychiatric consult conducted at SBH by Dr. Jean Robert Jacques on the night of May 11, 2013, the mother was unable to provide "a relevant history," except to say that police officers in Texas had brought her to a psychiatric hospital, where she remained for one week, that she "was medicated" there but had "refuse[d] meds," and that while she had been hospitalized, her cousin "raped" the child. Dr. Jacques found the mother to be "paranoid, suspicious and guarded." Her thought content was marked by "paranoid ideation." She had "poor" judgment, "limited" insight, and "fair" cognition. Dr. Jacques diagnosed the mother with "psychosis NOS [not otherwise specified]" and directed that she be held in the emergency department for further evaluation and administered

Risperdal. However, the mother once again refused that medication and it was not administered.

The following morning, the mother was evaluated by Dr. Salim Al Salem, to whom she reported, inter alia, that she was separated from her husband a month ago due to "domestic violence" and that her husband was "a member of [the] [F]ree [M]ason cult," whose other members were "backing him," which explained why she had been denied gas at a Texas gas station. As for the events that led to her hospitalization in Dallas, she reported that she had driven with the child from Louisiana to the home of a cousin, whom she believed was "doing witchcraft" that "affected [the child]." She left her cousin's home to find a motel, but police officers "followed" her and removed the child from her care, delivered the child to her cousin, and brought her to a psychiatric hospital. When she was discharged from the hospital, she picked up the child and, along with her sister, flew from Dallas to New York City.

The mother brought the child to SBH for a medical examination because she believed the child had been raped by her cousin. The rape claim was based on having observed a "cotton bud" lubricated with "[V]aseline" "go high up in [the child's] rectum" when she was dealing with the child's constipation.

Dr. Al Salem diagnosed the mother with "[d]elusional [d]isorder" and concluded that she currently was having a "delusion of persecutory type." After he spoke to the mother's sister and learned that she was willing to have the mother live with her, he directed that the mother receive Abilify, with the "first dose NOW" and a 30-day supply to be provided to her at discharge, along with a referral for follow-up care at Fordham Tremont Mental Health Center (Fordham Tremont).

The SBH emergency department discharge note listed the mother's discharge diagnosis as delusional disorder, "[a]ctive," and indicated that medications were "given as ordered" with instruction to follow up with Fordham Tremont "in 3-7 days."

The medical records also include entries dated June 11, 2013, when the mother came to the emergency department requesting to be reevaluated because she believed that she might not need medication anymore, and noted that she wanted to breast feed her child and that the medication was too costly. A "psych consult" was ordered, but the mother "left against medical advice" before one could be completed. However, the mother was given a refill of her medication "as a courtesy" and written instructions to follow up with Fordham Tremont. The followup was noted to be "urgent."

At the hearing, ACS caseworker Vanessa Wallace, who had been assigned to this matter, testified that, regarding her hospitalization in Texas, the mother told her that police officers had stopped her on a "highway" because they were Free Masons, who were "trying to take [the child]." The mother showed Ms. Wallace her discharge papers, dated May 8, 2013, from the Texas hospital (Green Oaks), and the papers indicated that the mother had "refused" medication. The mother told Ms. Wallace that Green Oaks had prescribed her Risperdal, but she did not take it because she was not "crazy."

The mother also reported to Ms. Wallace that after she put a Q-tip in the child's rectum, she concluded that her cousin had raped the child, noting that before the child had stayed with the cousin, a Q-tip would not go "all the way in." The mother did not tell Ms. Wallace that the child had been bleeding. The mother also asserted that she had been restrained at SBH when she did not want medical personnel to examine the child. Although she had been prescribed Abilify, she did not inform her doctor of her complaints about Abilify's side effects, and the mother told Ms. Wallace that she was not going to take Abilify. The mother also told Ms. Wallace that she had been directed to follow up with Fordham Tremont within three to seven days, but that the mother admitted she had still not done so by the seventh day.

The mother testified at the hearing that her daughter was born on February 14, 2013 and that the mother was her primary caretaker. She breast-fed her, changed her diapers and bathed her. The mother claimed that while she cared for the child, the child was always healthy and that she took the child to the pediatrician for regular checkups.

After separating from her husband in March 2013, she and the child lived together at a friend's house in Louisiana, but later they had to leave the state because they had "nowhere to stay." When she decided it was more economical to fly to New York from Dallas, Texas, rather than from Louisiana, she called her cousin, Francis Monio, who lived in Dallas, and asked him to "keep [her] for two days." However, when she arrived there, she learned that Monio wanted to separate her from the child because he had received a phone call from someone stating that the mother "was sick" and could not go to New York with the child. The mother then "decided not to stay" with Monio and went to find a motel.

According to the mother, at 3:00 a.m. on May 3, 2013, after she had driven 300 miles towards Dallas, she parked her car

on the side of the road to rest. While she was standing by her car on the side of the road to retrieve her cell phone from the backseat, police officers approached her, handcuffed her, and removed her to a psychiatric facility. She did not understand why the police officers had done this, and while in the hospital, she was not given a chance to talk, other than to say that she was "not sick." The mother was aware that Green Oaks medical personnel had diagnosed her with severe mood disorder with psychosis and prescribed her Risperdal, but she disagreed with the diagnosis and did not know why they prescribed her Risperdal, remarking, "I am not insane." Although she insisted she took some of her prescribed medication while in the hospital, she admitted she stopped taking it because "it made her sick."

After her release from Green Oaks on May 9, 2013, she and her sister picked up the child from Monio's home and then went to a motel, where she realized that the child was not feeling well. Between the time she left Monio's home on May 9, 2013, and when she brought the child to SBH on May 11, 2013, the child had been crying and without appetite, and she had a fever, a diaper rash, and a bloody discharge that the mother observed every time she changed the child's diaper. As the child was "really bleeding" "out of her behind," and was crying from pain, the mother's "first thought" was that Monio had sexually abused the child. The mother noted that she was sensitive to sexual abuse because she had been sexually abused as a child.

When she returned to New York, she took the child to SBH where she removed the child's diaper to show a nurse the bleeding and "the nurse saw what [she] was talking about." The nurse then spoke to the mother's sister—to whom the mother had previously shown the blood—after which the nurse called five or six security workers, who restrained the mother to a bed and took the child away. The mother did not know why the nurse had wanted her sister "to take over" or why hospital staff did not allow her to be present for the child's examination.

The mother told the SBH psychiatrist that she was not mentally ill, but merely that she had a "marital issue." She also complained to him that "nobody wants to listen to [her]." When she left SBH, she was given a prescription for Abilify. However, she did not comply with her medication regimen because the medication had made her feel sick. The physician

who prescribed her Abilify had told her that she "just [had] stress," which the mother wanted to treat with "family support," not medication. The mother also claimed that the medication cost too much money out-of-pocket, which she did not have, and that she only had Medicaid coverage in Louisiana. She never contacted Medicaid officials about obtaining medical coverage in New York State.

The mother also denied telling Ms. Wallace that she had put something in the child's rectum or any of her concerns about the Free Masons. A day after her discharge from SBH, the mother reported the child's bleeding to New York City police officers, but they had "refused to [take] a report."

In an oral fact-finding decision, later reflected in its written order, the court found that ACS had established the allegations in the petition by a fair preponderance of the credible evidence. The court credited the testimony of Ms. Wallace, finding it to be consistent with the medical records, and did not credit the mother's testimony, which it found "incredible." The court concluded that the mother "suffers from a mental illness, which impairs her ability to care for [the child], and that her conduct in failing to take prescribed medication and follow up with outpatient mental health services constitutes neglect."

II. Discussion

The overwhelming evidence in the record—much of which is entirely ignored by the dissent—showed that the mother was suffering from mental illness, that she lacked insight into her illness and need for treatment, and that her mental condition interfered with her judgment and parenting abilities, thus placing her infant daughter, who was totally dependent on the mother, at imminent risk of physical, mental, or emotional impairment (see Matter of Isaiah M. [Antoya M.], 96 AD3d 516, 517 [1st Dept 2012]; Matter of Naomi S. [Hadar S.], 87 AD3d 936 [1st Dept 2011], lv denied 18 NY3d 804 [2012]).

More specifically, the record evidence established that the mother had multiple delusional episodes, the most serious of which involved her being found on a Texas road in the middle of the night, uttering bizarre statements while her infant daughter was left in the front seat of her vehicle. That particular episode led to a one-week hospitalization in Texas where the mother was noncompliant and refused to take medication for her condition.

Back in New York, the mother continued to exhibit extremely concerning behavior. Her unfounded belief that her baby

daughter had been raped led her to bring the child to the hospital where the mother behaved irrationally, and was aggressive and threatening. This behavior led to the mother being restrained, sedated and hospitalized. While hospitalized, the mother continued to make strange and unfounded claims regarding her child being raped, which had caused her to repeatedly check her daughter's rectum. She was diagnosed with "psychosis NOS" and as having "[d]elusional disorder," yet continued to refuse necessary medication.

In an unscheduled visit a month after being released from the hospital in New York, the mother sought approval to cease all medications, despite the directions she had been given, and then left against medical advice when a psychological evaluation was requested.

The mother repeated her various bizarre and unfounded beliefs to the ACS caseworker, including her baseless fears about her daughter's rectum. She also admitted to the caseworker that, despite being prescribed Abilify for her condition, she would not take that medication, and denied that she had a mental health condition.

Finally, the mother's own testimony demonstrated her denial of her mental health condition and poor insight about her condition. Her testimony also corroborated that she repeatedly failed to comply with her medication regimen.

In sum, rather than minimize and separate each individual piece of evidence as insufficient for a neglect finding, as the dissent does, we find that the totality of the evidence in the record clearly established that the child is a neglected child (Family Ct Act § 1012 [f] [i] [B]).

A neglected child is one whose "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care" (Family Ct Act § 1012 [f] [i]). It is well settled that "[a] respondent's mental condition may form the basis of a finding of neglect if it is shown by a preponderance of the evidence that his or her condition resulted in imminent danger to the child[ ]" (*Matter of Noah Jeremiah J. [Kimberly J.]*, 81 AD3d 37, 42 [1st Dept 2010] [alterations in original]; Family Ct Act § 1046 [b] [i]).

In this case, the mother presented a risk of harm to her child through her unfounded fears that her daughter had been raped, since these fears resulted in the mother on different occasions

"testing" the child to see if she was raped, by checking her diaper and by sticking a Q-tip inside her, and making an unnecessary trip to the hospital (*see Matter of Kiemiyah M. [Cassiah M.]*, 137 AD3d 1279, 1280 [2d Dept 2016] [four-month-old child was in "imminent risk of harm" if left with mother, who called the police numerous times to report people outside the shelter threatening her and the child, which the evidence at the hearing established were delusions]).

Further, the mother displayed a "lack of insight" into her illness by refusing to agree that she had any mental health condition, despite her diagnoses, and by repeatedly refusing to comply with her medication regimen (*see Matter of Naomi S.*, 87 AD3d at 937 ["child's physical, mental or emotional condition was in imminent danger of becoming impaired as a result of the mother's long-standing history of mental illness and resistance to treatment"]; *see also Matter of Jacob L. [Chasitiy P.]*, 121 AD3d 502, 502 [1st Dept 2014] ["record demonstrated (mother's) lack of insight into her illness and repeated relapses due to her noncompliance with treatment and prescribed medication"]).

Significantly, lack of evidence as to actual injury to the child is inconsequential. "A showing that [the child was] impaired by [the mother's] failure to exercise a minimum degree of care is not required for an adjudication of neglect; it is sufficient that [the child was] 'in imminent danger of becoming impaired' " (*Matter of Annalize P. [Angie D.]*, 78 AD3d 413, 414 [1st Dept 2010]; *see also Nicholson v Scoppetta*, 3 NY3d 357, 369 [2004] [" 'Imminent danger' reflects the Legislature's judgment that a finding of neglect may be appropriate even when a child has not actually been harmed"]). Indeed, the imminent danger standard exists specifically to protect children who have not yet been harmed and to prevent impairment (*see Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79 [1995]).

With regard to mental illness, we have previously found that a parent suffering from untreated paranoid delusions presents an imminent risk of harm to children who are placed in her care (*see Matter of Michael P. [Orthensia H.]*, 137 AD3d 499 [1st Dept 2016]; *see also Matter of Immanuel C.-S. [Debra C.]*, 104 AD3d 615 [1st Dept 2013]). The fact that these cases also included evidence of actual harm to the children does not somehow indicate that a risk of imminent harm is not sufficient to sustain a neglect finding, as the dissent suggests. Nor does our

holding constitute a "drastic change in the law," as the dissent suggests. It would be irrational for the court, with knowledge of a risk of imminent harm to the child, not to act until actual harm is inflicted. This would be an absurd result. The child's safety and welfare should be the paramount concern and all necessary actions should be taken to prevent any harm to the child.

The neglect finding was not based only on the mother's mental illness. Rather, it was based on her mental condition in conjunction with her failure to comply with her medication regimen and follow-up treatment, and the fact that her mental illness impaired her ability to care for her infant daughter, and caused her to keep unnecessarily checking her daughter for evidence of rape. In other words, "the finding of neglect was appropriate here since [the mother] displayed a lack of insight into the effect of her illness on her ability to care for the child" (*Matter of Lakiyah M. [Shacora M.]*, 136 AD3d 424, 425 [1st Dept 2016]). The dissent concedes that we have previously found neglect as a result of a parent's mental illness where the parent "lacked insight into the effect of the untreated mental illness," even where there is no finding of actual harm to the child. Thus, the dissent's reliance on *Matter of Nialani T. (Elizabeth B.)* (125 AD3d 672, 674 [2d Dept 2015]), where there was no "causal connection between the mother's mental illness and actual or potential harm to the subject child," is inapposite.

Nor is there any validity to the dissent's position that "[t]here is no evidence whatsoever in the record" to support the Family Court's findings that the mother failed to engage in mental health services as recommended by physicians at SBH, and that the mother, "as a consequence of her mental illness, failed to exercise a minimum degree of care for the child, resulting in harm or imminent risk of harm to the child."

Regarding the failure to seek follow-up treatment, the ACS caseworker specifically testified that the mother told her that she failed to follow up with Fordham Tremont within seven days as directed. The dissent states that this testimony is contradicted by the May 12, 2013 medical records, which "establish that the seventh day after the mother's release from St. Barnabas had not yet occurred when the caseworker interviewed the mother." However, the June 11, 2013 medical records in evidence demonstrate that nearly one month after she was initially directed to follow up with Fordham Tremont the mother was again directed to follow up there, and that the

need to do so was urgent. The Family Court thus could make a fair inference from these records that the mother had not followed up as directed.

As for exposing the child to the risk of harm, the mother's unfounded allegations that her daughter was raped caused her to repeatedly check her child's rectum, including inserting a Q-tip inside her, and caused her to take the child to the hospital, subjecting her to an unnecessary examination. The fact that the mother was loving and nurturing at other times, as stressed by the dissent, is of no moment. The mother may have much maternal love for her child but her mental illness and refusal to get treatment posed an imminent risk of harm to the child. The child was also placed in imminent risk of harm when left alone in a car on the road at 3 a.m. while the mother was walking in the middle of the road, delusional and talking to herself.

The dissent disputes that the mother's claim that her daughter was raped was unfounded. However, there were no medical records or any other evidence submitted to substantiate that claim. Contrary to the dissent's suggestion, we are not placing the burden of proof on the mother to prove her daughter was raped. Rather, we find the evidence and facts of this case made her statement not believable. The mother's denial at the hearing of the statements she made to the caseworker and the staff at SBH regarding how her use of a Q-tip made her believe her daughter was raped calls the whole rape allegation into question. The mother's at times demented and delusional statements on this point, including that she was Jesus's wife, and that her three-month-old baby was the devil, and was killed and raped by a Free Mason and by her cousin, combined with the absurdity of the Q-tip test and proof of her mental illness, permit for a reasonable inference that her bare claim, without more, that her baby was raped was unfounded. Moreover, Family Court did not credit the mother's testimony and the court's credibility determinations are entitled to deference on appeal, and should not be disturbed (see Matter of Irene O., 38 NY2d 776, 777, 778 [1975]).

Similarly, contrary to the dissent's contention, the evidence showed that the mother repeatedly checked her daughter for evidence of rape. According to the caseworker, the mother checked the child's rectum with a Q-tip and had reported that on previous occasions the Q-tip "would not go all the way in," thus indicating she inserted the Q-tip more than once; the

medical records from SBH note the mother made a similar statement. The mother also testified that after her discharge from SBH she checked her daughter again and reported it to police officers.

The dissent's attack on the court's findings that the mother did not take medication similarly lacks a foundation. The dissent also points to the facts that the mother was "calm," "cooperative," and was "psychiatrically cleared" following her delusional episode and sedation at SBH. Once again, the dissent downplays the abnormal, aggressive, and threatening behavior exhibited by the mother and the incoherent statements made to the police officers and hospital staff, which resulted in her hospitalization in psychiatric wards in Texas and at SBH.

Initially, the fact that the mother presented as calm and cooperative at one point in time does not in any manner rule out mental illness. In any event, the record evidence clearly supports the finding that the mother had a mental illness. Notably, we have repeatedly held that "[e]xpert testimony or a definitive psychiatric diagnosis is not required to show a parent suffers from a mental illness because 'the consequences of the proceedings are temporary rather than permanent' " (*Matter of Jayvien E. [Marisol T.]*, 70 AD3d 430, 436 [1st Dept 2010]; *see also Matter of Devin M. [Margaret W.]*, 119 AD3d 435 [1st Dept 2014]; *Matter of Liarah H. [Dora S.]*, 111 AD3d 514 [1st Dept 2013]).

No medical expert was needed to determine that the child had been placed at risk by the mother's delusional thinking and her actions based on such delusional thoughts. A mentally healthy "new parent" would not conclude her three-month-old child was raped because a Q-tip she placed into the child's rectum went all the way in and then subject the child to an unnecessary trip to the hospital for examination.

The dissent, to reach her conclusion, minimizes the mother's non-compliance with her medication regimen. Far from simply failing to take medication "for one day" as the dissent describes it, the record, including the mother's own testimony, demonstrates that the mother repeatedly failed and refused to comply with her medication regimen. Commencing with her hospitalization in Texas, the mother refused prescribed medications. Her poor insight and noncompliance continued when she was hospitalized at SBH and refused Risperdal. The mother also told the ACS caseworker and testified that she did not and

would not take Abilify, despite having been prescribed it at SBH, and offered various insufficient excuses, including its cost and its side effects. The mother also demonstrated extremely poor insight into her condition, testifying that she could treat it with "family support" rather than medication.

Contrary to the dissent's position, the evidence regarding the mother's delusional episode and hospitalization in Texas was properly considered as part of the evidence supporting the neglect finding, and there is no basis for this Court not to rely on it.

Furthermore, contrary to the dissent's contention, Family Court properly conformed the pleadings to the proof, and the mother was afforded due process because she was able to contest the evidence and cross-examine the witnesses at the hearing.

In sum, the record demonstrates that the mother had a serious mental illness but showed poor insight into her illness, and placed her child at imminent risk of harm by failing to comply with follow-up treatment and her medication regimen. There is ample evidence in the record to show that the mother suffers from a mental health condition that needs to be monitored and treated with medications so that she may appropriately care for herself and her daughter, and have a chance to be reunited with her daughter, should that be the ultimate disposition in this matter.

Accordingly, the order of fact-finding, Family Court, Bronx County (Joan L. Piccirillo, J.), entered on or about January 23, 2015, which, after a hearing, determined that respondent mother neglected the subject child, should be affirmed, without costs.

GESMER, J. (dissenting). I respectfully dissent. The Family Court failed to make a finding that the respondent Melissa O.'s (mother) conduct impaired or threatened to impair her child's physical, mental or emotional condition, and therefore had no basis to hold that she neglected the child. I would further find that there was no admissible evidence before the Family Court from which it could have made such a finding. Accordingly, I would reverse the decision of the Family Court.

In a child protective proceeding, petitioner has the burden to prove abuse or neglect by a preponderance of the evidence (Family Ct Act § 1046 [b] [i]).

> "[A] party seeking to establish neglect must show . . . first, that a child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship" (*Nicholson v Scoppetta*, 3 NY3d 357, 368 [2004]; *see also* Family Ct Act § 1012 [f] [i] [B]).

Imminent danger "must be near or impending, not merely possible" (*Nicholson v Scoppetta*, 3 NY3d at 369). While a parent's mental illness may be an appropriate basis for a neglect petition under the right circumstances, " 'proof of mental illness alone will not support a finding of neglect'; the evidence 'must establish a causal connection between the parent's condition, and actual or potential harm to the children' " (*Matter of Nialani T. [Elizabeth B.]*, 125 AD3d 672, 674 [2d Dept 2015]; *see also Matter of Jayvien E. [Marisol T.]*, 70 AD3d 430, 435-436 [1st Dept 2010]). "A finding of neglect should not be made lightly" (*Matter of Jayvien E.*, 70 AD3d at 435).

In this case, the Family Court held a fact-finding hearing at which it heard testimony from the Administration for Children's Services (ACS) caseworker and the mother, and received in evidence only three exhibits: the medical records of St. Barnabas Hospital, where the mother was hospitalized for 24 hours; the intake report from the Office of Children and Family Services (ORT); and a group of photographs of the child. In its decision, the Family Court found that the mother

> "fails to provide the subject child . . . with proper supervision or guardianship in that [the mother] suffers from a mental illness which impairs her ability to care for [the child]. I further find that [the mother] has failed to take prescribed medication and has failed to engage in mental health services and that her conduct in failing to take prescribed medication and engage in mental health services constitutes neglect."

This was erroneous for two reasons. First, it finds neglect without a finding, or any support in the record for a finding, that the child was harmed or at imminent risk of harm. Second,

it makes findings not supported by admissible evidence in the record.[1]

I agree that the mother suffered from a mental illness, but that finding alone is insufficient for a neglect finding as a matter of law (*Nicholson v Scoppetta*, 3 NY3d at 368; Family Ct Act § 1012 [f] [i]). There is no evidence whatsoever in the record to support the other two elements necessary for a finding of neglect in this case: that the mother failed to engage in mental health treatment as recommended by physicians at St. Barnabas, and, more significantly, that the mother, as a consequence of her mental illness, failed to exercise a minimum degree of care for the child, resulting in harm or imminent risk of harm to the child.

The only facts that the Family Court could properly consider in finding neglect are those occurring prior to the date the petition was filed, May 16, 2013.[2] Those facts, based on the testimony and evidence at trial, are as follows. The mother states that she is from the Republic of the Congo, and has asylum status in the United States. The child was born on February 14, 2013. On May 11, 2013, the mother and child, accompanied by the mother's sister, appeared in the emergency room of St. Barnabas Hospital. The mother told staff there that she believed her cousin had sexually assaulted her daughter, and asked that the child be examined. She also stated that she had been raped, and asked to be tested for sexually transmitted diseases.

The mother told hospital staff that approximately a month earlier, she and the child had left the home they had shared with the mother's husband in Louisiana, due to domestic violence. The mother stated to St. Barnabas staff that she had

1. Respectfully, and as discussed below, I also find no basis in the trial record for the additional findings by my colleagues in the majority that the mother's fear that the child had been sexually abused was "unfounded," that she made an unnecessary trip to the hospital to have the child checked, that she "repeatedly check[ed]" her child for evidence of rape, including by inserting a Q-tip into her rectum, or that she "repeatedly" failed to comply with medication or other mental health treatment.

2. The Family Court apparently sought to justify its consideration of events occurring after the date of filing of the petition by stating at the conclusion of the testimony that "on the court's own motion, the pleadings are conformed to the proof." However, by doing so, it deprived the mother of due process, in that she was not provided an opportunity to respond to the amended petition (*cf.* Family Ct Act § 1051 [b]). Accordingly, I respectfully submit that it is error for the majority to rely on any events after the filing of the petition.

been in Texas, staying with her cousin who lives there. When she left to go to a motel, the mother was detained by the police, who brought her daughter to the cousin's home and took the mother to a psychiatric hospital. After a one-week stay, she was discharged on May 10, 2013 pursuant to a court order. Immediately after her release, the mother and her sister retrieved the child from the cousin's home, and flew to New York, arriving at St. Barnabas on May 11, 2013.

When the mother arrived at St. Barnabas with her sister and baby at approximately 11:30 a.m. on May 11, she was exhibiting "erratic behavior, screaming and upset . . . aggressive," and the hospital staff were unable to take the mother's vital signs. As a result, hospital staff restrained and sedated her. However, upon waking that evening, the mother was calm and cooperative, and spoke logically, and remained so until her discharge in "stable" condition at about noon the following day. The period of time during which the mother's behavior at St. Barnabas was "aggressive" was at most a few hours. According to the psychiatrist who examined her on May 12, "she denie[d] hallucinations," and also denied suicidal or homicidal thoughts or plans, "in particular toward her baby daughter." Based on the psychiatric evaluation, she was psychiatrically cleared, and discharged with a 30-day supply of Abilify and directions to follow up with Fordham Tremont Community Mental Health Center (Fordham Tremont) within seven days.

The next day, May 13, 2013, the ACS caseworker, Ms. Wallace, interviewed the mother at her sister's home.

On May 16, 2013, ACS filed its petition. The child was placed with the maternal aunt, in whose home the mother also lived, on condition that the mother not be left alone with the child.

The Family Court's conclusion that the mother suffered from a mental illness is supported by the records from St. Barnabas, which state that she was diagnosed with delusional disorder. The note by the psychiatrist who made that diagnosis further states that the mother was "calm, cooperative, with well articulated and goal directed speech, which is coherent." He further found that the mother was "psychiatrically cleared" for discharge. This finding alone would not support a finding of neglect.

The Family Court and my colleagues in the majority base their determination that the mother did not take prescribed medication on the mother's statement to the ACS caseworker on May 13, 2013, the day following her discharge, that she had

not taken the medication prescribed to her at St. Barnabas, and her statement to the caseworker and hospital staff that she had refused medication prescribed in Texas the week prior. Since she had only been out of the hospital in Texas for one day before she came to New York, she could only have failed to take the medication prescribed in Texas for one day. I would find that her failure to take the medication prescribed in Texas and by St. Barnabas for one day does not constitute a basis for a neglect finding.[3]

The Family Court and the majority apparently based their conclusion that the mother had failed to engage in mental health services on a belief that she had failed to comply with St. Barnabas's recommendation that she follow up with Fordham Tremont within seven days following her discharge on May 12, 2013; that is, by May 19, 2013. The only evidence to support the finding as to the mother's noncompliance is the caseworker's testimony that, at the time of her initial interview with the mother on May 13, 2013, the mother had not yet contacted Fordham Tremont. However, as of that date, she was not yet out of compliance with St. Barnabas's recommendation; in fact, her time to do so had not even run on the date the petition alleging the mother's noncompliance was filed, May 16, 2013. Accordingly, the record does not support a finding that the mother failed to comply with St. Barnabas's recommendation that she follow up with Fordham Tremont for treatment by May 19, 2013. The majority notes that the caseworker testified that the mother told her she had not gone to Fordham Tremont by the seventh day. However, this testimony is directly contradicted by the medical records in evidence, which establish that the seventh day after the mother's release from St.

---

**3.** The majority, citing cases where a parent's repeated relapses due to failure to comply with treatment resulted in a finding that the child was neglected (*Matter of Jacob L. [Chasitiy P.]*, 121 AD3d 502 [1st Dept 2014]; *Matter of Naomi S. [Hadar S.]*, 87 AD3d 936, 937 [1st Dept 2011], *lv denied* 18 NY3d 804 [2012]), bases its finding that the mother "repeatedly" failed to comply with her medication regimen on the "totality" of the evidence in the record. However, the only evidence in the record that the mother ever failed to comply with medication prior to the filing of the petition is her admission to St. Barnabas staff and the ACS caseworker that she did not take medication prescribed to her in Texas a few days before, and her admission to the ACS caseworker that she had not taken the medication prescribed at St. Barnabas the day before. These allegations covering a matter of days, even if true, do not amount to a finding that the mother "repeatedly failed and refused to comply with her medication regimen."

Barnabas had not yet occurred when the caseworker interviewed the mother.[4]

More importantly, there is no evidence to support the Family Court's statement that the mother, as a result of her mental illness, failed to exercise a minimum degree of care for the child, or that this harmed or placed the child at imminent risk of harm. Indeed, the ACS caseworker testified that the mother is a "very loving mother" and "very nurturing," that the mother attended to the child appropriately, that the child did not appear to be in any pain, but rather appeared "good," and that the caseworker saw nothing wrong with the child.

The Family Court's and the majority's conclusion that the mother's illness had an adverse effect on her child is apparently based on her having brought her daughter to St. Barnabas Hospital to be examined because she feared that her daughter had been sexually abused in Texas. Although the child was evaluated in the St. Barnabas pediatric department, no evidence was presented at the fact-finding hearing that the child was not well-cared for or was found to be in any distress. I respectfully disagree with the majority's finding that the mother's fear was "unfounded," and that her taking the child to St. Barnabas was "unnecessary." I find no support for such a finding in the record. Indeed, the Family Court did not make either of these findings.[5] Furthermore, there is absolutely no evidence in the trial record that the mother took the child to be examined for possible sexual abuse on any other occasion. Accordingly, the mother's having taken the child to St. Barnabas on one occasion to address her concern is not an appropriate basis for a finding that the child was harmed or at imminent risk of harm by reason of the mother's mental illness.

---

**4.** The majority also notes that the mother returned to St. Barnabas on June 11, 2013 to discuss her medication prescription. However, this does not support a conclusion that the mother failed to follow through with treatment for two reasons. First, this medical record was made nearly a month after the neglect petition was filed, and therefore may not be considered to prove the facts alleged in the petition. Second, the ACS caseworker testified on cross-examination that the mother told her the medication prescribed made her sick, and that the caseworker told the mother to speak to her doctors about this. Accordingly, if the mother returned to the hospital to discuss her medication, she was complying with the caseworker's recommendation.

**5.** The majority improperly shifts the burden to the mother to prove that her daughter had been raped; rather, it was the obligation of ACS to prove the allegations of the petition that the mother had obtained improper or unnecessary medical care for her daughter (Family Ct Act §§ 1046 [b] [i]; 1051 [a]).

There is also no evidence that the mother "ke[pt] unnecessarily checking her daughter for evidence of rape," as the majority states. The St. Barnabas records include the mother's statement to the evaluating psychiatrist in which she explained her fear that the child had been sexually abused by stating, "because as my daughter get constipated, and I use vasal[i]ne on cotton bud, which started to go high up in her rectum." The ACS caseworker testified that the mother made a similar statement about this single incident to her. More importantly, there is no evidence that the mother's use of a cotton bud to treat constipation on one occasion harmed the child in any way.[6] The Family Court was no doubt appropriately concerned about strange-sounding statements made by the mother to St. Barnabas staff and the ACS caseworker, as are my colleagues in the majority. However, the psychiatrist at St. Barnabas cleared the mother for discharge, and the caseworker observed that the mother appropriately cared for her child. Notably, at trial, the mother showed no sign of delusional thinking. In any event, the statements, without more, are insufficient for a finding of neglect.

To the extent that Family Court based its finding of neglect on incidents alleged to have occurred in Texas just prior to the mother's hospitalization at St. Barnabas, I would find that there is insufficient evidence that the child was harmed or at imminent risk of harm during that period as well. Aside from the mother's statements to St. Barnabas personnel, discussed above, the only evidence of those events was from the ORT and the mother's statements to the ACS caseworker, upon which my colleagues in the majority rely heavily. The statements in the ORT concerning the events in Texas reflected the worker's notes of a conversation with a child protective services worker in Texas who was first contacted on May 10, 2013, after the mother had left Texas. All of the information conveyed by the Texas worker appears to be hearsay, and we should not rely on it. As to the mother's statements about the events in Texas, she admitted that the police took her to Green Oaks Hospital, that the police took her daughter to her cousin's home, and that, upon the mother's discharge several days later, the mother and her sister picked up the child and traveled together

---

**6.** The majority suggests that, because the mother became concerned that the cotton bud went in further than it had before, the mother must have been using the cotton bud to check for rape on prior occasions. I find no support for this contention, and neither did the Family Court.

to New York. There was no indication from the mother's statements, or any other evidence, that the child was harmed or at imminent risk of harm during the events in Texas.

In light of the lack of actual evidence of injury to the child, ACS and the Attorney for the Child argue that "courts have found that paranoid behavior . . . is sufficient to show risk of impairment to the child." My colleagues in the majority appear to agree with this drastic change in the law. However, none of the cases cited by ACS, the Attorney for the Child, or in the majority opinion support this claim. In the majority of those cases, there was evidence that the child's mental or physical condition was actually impaired due to the parent's mental illness (*Matter of Michael P. [Orthensia H.]*, 137 AD3d 499, 500 [1st Dept 2016] [child's teeth decayed, evidencing mentally ill mother's failure to provide basic dental care]; *Matter of Immanuel C.-S. [Debra C.]*, 104 AD3d 615 [1st Dept 2013] [mentally ill mother's home in "deplorable condition," and child had not seen doctor or dentist in several years]; *Matter of Kiemiyah M. [Cassiah M.]*, 137 AD3d 1279, 1280 [2d Dept 2016] [witness testified to seeing infant dressed only in diaper, shivering by open window while mother was distracted by delusions]; *Matter of Yu F. [Fen W.]*, 122 AD3d 761, 762 [2d Dept 2014] [psychiatrist and hospital social worker testified that child would be at risk if returned to mother, because of her untreated mental illness]; *see also Matter of Noah Jeremiah J. [Kimberly J.]*, 81 AD3d 37, 40 [1st Dept 2010] [mother's psychiatrist testified about her mental illness and that, without medication, she could not care for son]). Similarly, the majority cites to *Matter of Annalize P. (Angie D.)* (78 AD3d 413 [1st Dept 2010]), where the mother was found to have failed to provide her children with adequate supervision, including by permitting the child to have five excused and 24 unexcused school absences in a school year. I do not disagree with my colleagues that a showing of imminent harm due to inadequate care is sufficient for a neglect finding. However, here, petitioner has not proved harm or imminent harm, or that the mother failed to provide adequate guardianship. It has shown only that she suffered from a mental health condition, which is not adequate for a neglect finding without more.

The only cases cited by ACS or the Attorney for the Child, or in the majority opinion, that do not include a description of actual harm to the child as a result of a parent's mental illness specifically found that the mentally ill parent lacked insight

into the effect of the untreated mental illness, and that this affected the parent's ability to care for the child[7] (*Matter of Jalicia G. [Jacqueline G.]*, 130 AD3d 402, 403 [1st Dept 2015]; *Matter of Jacob L. [Chasitiy P.]*, 121 AD3d 502 [1st Dept 2014]; *Matter of Essence V.*, 283 AD2d 652, 653 [2d Dept 2001]).[8] In *Matter of Isaiah M. (Antoya M.)* (96 AD3d 516 [1st Dept 2012]), cited by the majority, the mother, who was involuntarily hospitalized for a month, testified that she had auditory hallucinations telling her to harm her child (*id*. at 517). There is no such finding in this case, or any basis for one. Indeed, the evaluating psychiatrist at St. Barnabas determined that the mother denied any homicidal ideation, "in particular toward her baby daughter," and psychiatrically cleared her for discharge.

These cases are distinguishable in other respects as well. In *Matter of Jalicia G.*, this Court found that the child was in imminent harm because of the child's exposure to domestic violence in the home (130 AD3d at 403). In *Matter of Jacob L.*, the mother had multiple extended psychiatric hospitalizations and repeated relapses due to her noncompliance with treatment (121 AD3d at 502).[9] In *Matter of Essence V.*, the Court specifically found that the mother was unable to care for the child without treatment, including medication (283 AD2d at 653). Moreover, none of those cases alter the rule that a neglect finding requires a determination that a child is impaired or at imminent risk of impairment as a result of the parent's failure to provide a minimum degree of care, including as a

---

**7.** Thus the majority is incorrect in stating that I concede that a parent's lack of insight into his or her mental illness provides a basis for a finding of neglect; rather, ACS must prove that the parent's lack of insight affected the parent's ability to care for the child.

**8.** ACS also cites to *Matter of Caress S.* (250 AD2d 490 [1st Dept 1998]). However, this case predates the Court of Appeals' opinion in *Nicholson v Scoppetta* (3 NY3d 357 [2004]), which holds that a finding of neglect must be based on both a failure by the parent to provide a minimum degree of care, and resulting harm or imminent risk of harm to the child (*see also Matter of Jayvien E.*, 70 AD3d at 435-436). Accordingly, to the extent that *Caress S.* held that a finding that a parent's mental illness alone is sufficient for a neglect finding, that case is no longer good law.

**9.** Similarly, in *Matter of Naomi S. (Hadar S.)* (87 AD3d 936 [1st Dept 2011], *lv denied* 18 NY3d 804 [2012]), cited by the majority, the mother had had multiple extended hospitalizations and repeated relapses of her mental illness, due to her failure to comply with treatment, and there was a finding that release of the child would pose dangers to the child (*id*. at 937). Moreover, the focus in that case was whether or not services were required for the mother after the father obtained custody of the child (*id*.).

result of the parent's mental illness (*Nicholson v Scoppetta*, 3 NY3d at 368; *Matter of Jayvien E.*, 70 AD3d at 435-436). Finding only that a parent suffered from delusional disorder, persecutory type, is simply not sufficient for a finding of neglect. Since petitioner failed to show either that the mother's mental illness caused her to fail to exercise a minimum degree of care for the child, or that the child was ever harmed or at imminent risk of harm as a consequence of such failure, I would reverse the Family Court order of fact-finding and dismiss the petition.

RICHTER and GISCHE, JJ., concur with TOM, J.P.; SAXE and GESMER, JJ., dissent in an opinion by GESMER, J.

Order of fact-finding, Family Court, Bronx County, entered on or about January 23, 2015, affirmed, without costs.